**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION AT LONDON**
**CIVIL ACTION NO. 6:21-cv-00149-CHB**
*Electronically Filed*

S.A., by and through her next friends,
her parents, W.A. and L.A.                                        PLAINTIFF

v.                        **DEFENDANTS' MEMORANDUM OF LAW**
          **IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


Board of Education of Perry County, Kentucky;
Jonathan Jett, Supt., individually and officially;
Josh Baker, Principal, individually and officially;
Krystal Watts, teacher, individually and officially

                                                          DEFENDANTS

** ** ** ** ** ** ** ** **

Come the Defendants, Board of Education of Perry County, Kentucky; Jonathan Jett.
Superintendent of Perry County Schools, Individually and Officially; Josh Baker, Principal,
Individually and Officially; and Krystal Watts, Teacher, Individually and Officially, by counsel,
and for their Memorandum of Law in support of their Motion for Summary Judgment pursuant
to Fed. R. Civ. P. 56, state as follows:

**INTRODUCTION**

"S.A.", is minor who attended school in the Perry County School system through her
sixth grade year at R.W. Combs Elementary School in Hazard, Ky.  On May 12, 2021, near the
end of her sixth grade year, S.A took some of her mother's pills at her home after her family had
gone to bed and she was subsequently found unresponsive by another family member.  S.A.,
through her mother, has sued the Perry County Board of Education, Perry County School
Superintendent Jonathan Jett, R.W. Combs Elementary School Principal Josh Baker and R.W.

Combs Elementary School teacher Krystal Watts, alleging that she attempted to commit suicide on May 12, 2021 because they failed to prevent the bullying to which she was subjected by a male student at R.W. Combs Elementary School.   Plaintiff alleges that Defendants were grossly negligent for failing to address bullying at R.W. Combs Elementary (Count I); that they retaliated against S.A for reporting bullying, in violation of KRS 344.280 (Count II); that they intentionally inflicted emotional distress on S.A. (Count III); and that they violated S.A's Fourteenth Amendment Civil Rights by depriving her of a public education in violation of 42 USC section 1983 and 42 USC section 2000(d) (Counts IV and V).   Defendants submit that there are no material issues of fact that they are liable for the allegations Plaintiff has asserted against them and respectfully request this Court to GRANT them summary judgment and to DISMISS this lawsuit.

### STATEMENT OF FACTS

S.A. lives in Perry County with her mother, father, brother and several foster children.[1] SA attended school at R.W. Combs Elementary School in Perry County until she was in the 7th grade at which time she transferred to Hazard Independent Middle School in the fall of 2021.[2] When she was in the 5th and 6th grade at RW Combs, S.A.'s math teacher was Ms. Watts.[3] During her 5th and 6th grade years at RW Combs, students attended classes both in person and remotely due to the pandemic.[4]  S.A. struggled academically during periods of remote learning because she did not understand the material she was being taught.[5]  Nonetheless, S.A. was able to complete both grades and passed onto the 7th grade.[6]

---

[1] Exhibit 1, Deposition of S.A., hereinafter "SA", p. 6-7
[2] *Id*, SA p. 11-12
[3] *Id*., SA p. 11
[4] *Id.*, SA p. 15
[5] *Id.*
[6] *Id.,* SA p. 16

When she was deposed, S.A. testified that while she attended RW Combs, she was bullied and that "they would call me names and would not leave me alone" and that "he" told me to shut-up and go back to Mexico where I'm from."[7]  When she was asked who "he" was, she identified another student by the name of "LG"[8] who had been her classmate since she was in kindergarten.[9] SA never lived in Mexico; she never talked about Mexico; and no one identified her as Mexican so she was not sure why LG thought she was Mexican.[10]

According to S.A. near the end of her 5th grade year, S.A. was on the school playground when LG called her names and she started crying.[11] Another female student came to check on her and when she told her what happened, this girl told her that LG also called her names including "whore" and "fat".[12] SA and ML went to tell their teacher, Ms. Dunn, what happened and LG was sent to the principal's office.[13]  SA did not know if LG was disciplined but she testified that the following week, LG called her "ugly", "stupid" and "fat".[14]  However, S.A. did not report this to anyone at school.[15]

S.A. recalled that when she was in the 5th and 6th grades, R.W. Combs Elementary Principal Baker came to her classroom to talk about bullying.[16]  Nonetheless, S.A. never told Baker that she had been bullied.[17]  During her 6th grade year, S.A. testified that LG called her "beaner" and that she heard him call other students names too including "stupid", "ugly" and

---

[7] Id., SA p. 22
[8] All minor students will be identified only by their initials to protect their identities in compliance with 20 U.S.C.A. section 1232, the Family Educational Rights and Privacy Act (FERPA) and KRS 61.870, the Ky. Family Educational Rights and Privacy Act (KFERPA)
[9] Id., SA p. 23
[10] Id., SA p. 25
[11] Id. ,SA p. 25-26
[12] Id., SA p. 26
[13] Id., SA p. 26-27
[14] Id., SA, p. 28
[15] Id., SA p. 29
[16] Id., SA p. 31.
[17] Id., SA p. 31

"retard".[18]  Ms. Estep was S.A's teacher at the time and according to S.A., Ms. Estep told LG that calling students names was wrong.[19]

On another occasions, LG called S.A. a "border hopper" but S.A. testified that she was the only one who heard that comment.[20] On another occasion during her 6th grade year at RW Combs, S.A. saw one of her friends crying on the playground and when she asked her what was wrong, she said LG called her a "whore".[21]  S.A asked her friend if she was going to tell the teacher and her friend said she would if S.A. went with her.[22] When they went to report what happened, Ms. Watts asked S.A. if she was there to discuss something that involved her and S.A. did not respond at which point Ms. Watts told her she could go and play while she spoke to her friend.[23]  S.A. claimed that Ms. Watts did not give her a chance to tell her about what LG had been calling her.[24]  S.A did not know what her friend reported to Ms. Watts and specifically whether she told her that LG was calling S.A. names.[25]  S.A. testified that LG continued to call her names but that she never reported him to anyone at school because she was embarrassed.[26]

During her 6th grade year when students were attending classes remotely, S.A. communicated with LG via X-box and Snapchat with devices that her parents bought her and sometimes, he would call her names on those platforms.[27]  She never reported this to her parents and would turn off her cell phone or X-box to avoid LG.[28]  When asked why she did not tell her

---

[18] *Id.,* SA p. 32
[19] *Id.*
[20] *Id.,* SA, p. 33
[21] *Id.,* SA p. 34
[22] *Id.,* SA p. 35
[23] *Id.,* SA p. 36
[24] *Id.,* SA p. 37
[25] *Id.,* SA p. 43
[26] *Id.,* SA p. 44
[27] *Id.,* SA p. 38-39
[28] *Id.,* SA p. 40

parents, SA said LG was her friend.[29]  She admitted that she sometimes called him names, like "stupid".[30] SA had a Chromebook that she had been assigned by her school for remote learning but she never used it to communicate with LG.[31] She never reported LG to his parents and her parents never contacted LG's parents.[32]  S.A. testified that she no longer has the cell phone she had when she and LG were communicating on Snapchat and that she has no documentation of any of the name calling by LG.[33] Other than the time she went with her friend to tell Ms. Watts that LG had called her friend a "whore", SA never attempted to report that LG called her names to anyone who worked in the Perry County School District.[34]

In May of 2021, near the end of the school semester, students returned to in person instruction at R.W. Combs Elementary.[35] S.A. testified that she did not like to go to school at that time and blamed it on Ms. Watts for allegedly "screaming" at her class that she was tired of parents calling her.[36]  On May 12, S.A. told her mother she was sick with menstrual cramps so she did not have to go to school.[37] She had no communications with LG that day.[38]  Later that night, S.A. located a bottle of Flexeril that she had previously seen in her mother's medicine drawer.[39] At her deposition, S.A. testified that she took some of those pills to end her life even though she could not recall what she was thinking at the time.  She wrote a note and then an hour later, took some of the pills and then laid down and the next thing she recalled was waking up in

---

[29] *Id.,* SA pp. 40 and 42
[30] *Id.,* SA p.
[31] *Id.,* SA p. 41
[32] *Id.,* SA p. 42
[33] *Id.,* SA p. 45-46
[34] *Id.,* SA pp. 46-47
[35] *Id.,* SA, p. 55
[36] *Id.,* SA p. 57
[37] *Id.*
[38] *Id.,* SA p. 61
[39] *Id.,* SA p. 63

the ICU.[40]   After she was released from the ICU, S.A. was transferred to Good Samaritan Hospital where she underwent mental health treatment.[41]   S.A. testified that she told her counselor that she tried to end her life because LG called her names.[42]

SA returned to RW Combs after she was released from the hospital before the end of her 6th grade to take some standardized tests in Principal Baker's office. At that time, she did not tell Mr. Baker that she had been bullied and that she tried to commit suicide because of the names LG called her.[43] The summer after her 6th grade year, S.A. decided to transfer to another school.[44] S.A. testified that Principal Baker told her that LG was no longer a student at Combs but she and her parents decided to transfer her anyway.[45]

S.A. does not know Supt. Jett and never had any discussions with him.[46] S.A never tried to tell Principal Baker that LG bullied her or called her names.[47] The only time she had any discussions with Ms. Watts was when she and her friend went to tell Ms. Watts that LG called her friend a "whore" at which time S.A never mentioned that LG was calling her names too.[48] No one other than LG called S.A. names like "border hopper" or "beaner".[49]   The only 'bullying' that S.A. experienced at R.W. Combs was the name calling by LG.[50]   At the time she was deposed, S.A. testified that she no longer had suicidal thoughts.[51]

---

[40] *Id.,* SA p. 66-67
[41] *Id.*
[42] *Id.,* SA p. 68
[43] *Id.,* SA p. 69-70
[44] *Id.,* SA p. 70
[45] *Id.,* SA p. 72
[46] *Id.,* SA p. 77
[47] *Id.,* SA p. 78
[48] *Id.*
[49] *Id.,* SA p. 84
[50] *Id.,* SA p. 87
[51] *Id.,* SA p. 69

Lisa Allen is S.A's adopted mother and she testified that she and her husband adopted S.A. when she was 13 months old.[52]   S.A. is "biracial" as her birth mother was white and her birth father was Hispanic.[53] At the time they adopted S.A., Lisa and her husband also adopted S.A.'s brother who had the same birth mother but a different father who was not Hispanic.[54] When she adopted S.A., the judge told Lisa that she could identify S.A. any way she wanted so Lisa always identified S.A. as "white" when she filled out paperwork for school.[55] The paperwork Lisa filled out for the Perry County School system asked if S.A was Hispanic to which Lisa responded "no".[56]   According to Lisa, S.A. knew she was biracial but she never identified herself as being a part of any racial group. [57]

S.A. started as a student in the Perry County schools when she was four.[58] S.A. attended elementary school at R.W. Combs Elementary from the age of 4 though the end of her 6th grade year.[59]  In the 7th grade, she transferred to the Hazard Independent Schools where she continues to attend school. [60] According to Lisa, until she was in the 5th Grade, S.A. was a good student and had excellent grades. [61] When S.A. was in the 5th grade, her school went to non-traditional Instruction (NTI) due to COVID and she attended classes remotely.[62] S.A. was provided a tablet to take home and she used that to connect with her classes during the school day.[63] Lisa had to sign an acceptable use policy before S.A. received the tablet and that policy specifically

---

[52] Exhibit 2, Deposition of Lisa Allen, hereinafter "Allen", p. 7.
[53] *Id.,* Allen, p. 9
[54] *Id.*.
[55] *Id.,* Allen, 45-46
[56] Exhibit 3, Person Summary Report for S.A.
[57] Exhibit 2, Allen , p. 47
[58] *Id.,* Allen, p. 12
[59] *Id.*
[60]*Id.*
[61]*Id.,* Allen, p. 30
[62] *Id.,* Allen, pp. 30-31
[63] *Id.,* Allen, p. 31

prohibited using the tablet for non-school matters.[64]   Lisa testified that NTI was a strain on everyone. [65] When she was in the 6th grade, S.A. had the option of attending classes in person or remotely and she chose to attend in person.[66] Notwithstanding her return to in school instruction, S.A.'s grades continued to fall; she did not want to go to school anymore and she became distant and quiet.[67]   S.A. never told Lisa that she was being bullied at school until after S.A.'s alleged suicide attempt.[68]

When S.A. was in the fourth grade, one of S.A's teachers, Ms. Dunn, called Lisa and told her that S.A would be upset when she came home that day because she had been to the principal's office.[69] Ms. Dunn told Lisa another student had found S.A crying in the bathroom and took her to the principal's office at which time S.A. reported that a male student, "LG", called her a "beaner" and asked her what she was to which S.A. responded that she was Mexican.[70] Lisa was informed that LG was asked to apologize to S.A and over the following weekend, LG contacted S.A. through X-box and apologized.[71]   According to Lisa, S.A. accepted LG's apology. The following Monday, Lisa called Principal Baker to find out if there was anything more that would happen because S.A. had told her this had been going on for some time.[72] Mr. Baker advised that he would speak to LG's parents but that he had not been able to talk to anyone else at that time. [73] After she spoke to Mr. Baker, Lisa asked S.A if she was having any more problems with LG and she said "no". [74]   S.A never told Lisa she was upset or

---

[64] Exhibit 4. Acceptable Use Policy
[65] Exhibit 2, Allen, p. 31.
[66] *Id.,* Allen, p. 67
[67] *Id.,* Allen, pp. 68
[68] *Id.,* Allen, p. 68
[69] *Id.,* Allen, p. 37
[70]*Id.,* Allen, p. 39-40
[71] *Id.,* Allen, p. 44
[72] *Id.,* Allen, p. 44
[73]  *Id.,* Allen, p. 49
[74]  *Id.,* Allen, p. 49-50

depressed after the incident in the 4th grade. [75]   The summer after S.A's 4th grade year was uneventful and Lisa thought the issues with LG were resolved.[76]   Lisa never contacted LG's parents to report that their son was harassing or bullying her daughter.[77]

During her 5th and 6th grade school years at R.W. Combs, S.A. never reported any ongoing issues with LG. The first time Lisa heard anything about any ongoing issues between S.A and LG was after S.A. overdosed on her mother's pills at the end of her 6th grade school year.[78]

On May 12, 2021, S.A. was at home and everyone in her household had gone to bed when Lisa was awakened by the sound of glass breaking and one of her foster children screaming S.A.'s name.[79]   Lisa went to S.A.'s room and observed her "flopping around the floor like a fish out of water".[80]   One of the kids found a pill bottle on the floor and Lisa said it looked like several pills were gone.[81]   Lisa testified that she had been prescribed muscle relaxers after she had back surgery and that those pills were in the medicine cabinet in her bathroom.[82]   Lisa testified that S.A. had started her menstrual period and that she told her mother that she had cramps that day and that after she saw the pills on the floor, Lisa assumed someone told S.A. to take the muscle relaxers for her menstrual cramps.[83]

An ambulance was summoned and S.A. was transported to the local ARH Hospital in Hazard.[84]   When the ER staff asked Lisa whether this was a suicide attempt, Lisa responded that

---

[75] *Id.,* Allen, p. 51
[76] *Id.*
[77] *Id.,* Allen, p. 54
[78] *Id.,* Allen, p. 55
[79] *Id.,* Allen, p. 71
[80] *Id.*
[81] *Id.,* Allen, p.73
[82] *Id.*
[83] *Id.,* Allen, p. 74
[84] *Id.,* Allen, p. 75

was not possible and that S.A. took the pills because she had cramps. [85]   The ER doctor told Lisa that he thought S.A. had attempted suicide because he found marks on her arms that looked like she had cut herself.[86] Lisa had never seen these cuts before then.[87]   S.A.   was   placed   on   a ventilator and transferred to UK.[88] She was in the ICU at UK for two nights and then moved to a regular room after which she went to Good Samaritan Hospital for mental health treatment.[89]

When Lisa returned home after S.A. was transferred to UK, she found a note that S.A. had written and left on her bed table.[90]   The note does not mention LG nor did it reference anything about bullying at school. It provides no explanation for why S.A. wanted to end her life. While she was at Good Sam, Lisa asked S.A. what happened. And at that time, S.A. told her that LG had been calling her names all along and that she could not take it anymore.[91]   She said LG called her a "beaner" and that he called other girls "whores" and that every time he would get on X-box, she would get off.[92]   She said LG called her "border hopper" and said that President Trump was going to build a wall.[93] After LG pushed another student and S.A. tried to intervene, he called her a "beaner" and "retard lover".[94]    S.A. admitted that she had cut her arms and said it was because she couldn't take it anymore.[95]   S.A told Lisa that she did not told her about LG because she was afraid to get LG in trouble and that she would have to move to another school and would have to make new friends.[96]   Lisa asked S.A. if she had reported LG to anyone at school and S.A. told her that she saw a female student crying on the playground and that the girl

---

[85]  *Id.,* Allen, p. 76-77 and Exhibit 5, ARH ER report
[86] Exhibit 2, Allen, p. 89
[87] *Id.*
[88] *Id.,* Allen, p. 78
[89] *Id.,* Allen, pp. 79, 81.
[90] *Id.,* Allen, p. 83, Exhibit 6, SA note.
[91] Exhibit 2, Allen, 82-83, 90
[92] *Id.*
[93]  *Id.,* Allen, p. 84
[94] *Id.,* Allen, 85
[95] *Id.,* Allen, p. 90
[96] *Id.*, Allen, pp. 92, 54, 82-83

told SA that some boys called her a "whore" and when S.A. asked if she wanted to report this to the teacher, the student said she would if S.A. came with her.[97] When they got to Ms. Watts' classroom, Ms. Watts asked S.A. if they were there to report something that had to do with S.A. and when she did not respond, Ms. Watts sent her out of the room while she spoke to the student who had been crying.[98]

Lisa confirmed that S.A. never reported any issues to anyone in the Perry County School District about LG, including the Defendants.[99] After Lisa contacted Principal Baker to tell him about S.A.'s suicide attempt, Mr. Baker assured her he would investigate whether anyone was aware of S.A.'s issues.[100]  He asked Lisa for copies of any of the "bullying" messages S.A. received from LG but Lisa claimed that LG had deleted those messages and that S.A. had dropped her cell phone in the lake and no longer had it to access to it.[101] Subsequently, Mr. Baker told Lisa that the investigation indicated that no one had received any report from S.A. that she was bullied or that LG had called her names.[102]

In July of 2021, Lisa decided to transfer SA to the Hazard Independent School District after which Principal Baker called her when that district requested S.A.'s school records.[103] When Lisa told him that S.A. was transferring because of LG, Mr. Baker told her that LG had transferred out of the Perry County Schools.[104] Lisa decided to transfer S.A anyway and then later, learned that LG had also transferred to the Hazard Independent School District.[105] Lisa

---

[97] *Id.,* Allen, p. 93
[I] *Id.*
[99] *Id.,* Allen, p. 95
[100] *Id*., Allen, 96
[101]  *Id.,* Allen, pp. 149-150
[102] *Id.,* Allen, p. 97
[103] *Id.,* Allen, p. 111.
[104] *Id.*
[105] *Id.,* Allen, p. 113

called the new principal and he assured her that S.A. and LG would be separated at school.[106] Since S.A. transferred to Hazard Independent, she has had no issues with LG.[107]  According to Lisa, SA is more concerned that her new friends will find out about her suicide attempt and judge her.[108]

Lisa was asked about the allegations in her Complaint and she confirmed that the only time any report was made that S.A. had been bullied was when she was in the 4th grade and that Lisa had no knowledge that any of the Defendants knew that S.A was being bullied after that.[109] Lisa knew the Perry County School Board had bullying policies which were in effect when S.A attended school there but that she did not believe the Supt. or Principal properly trained the staff on those policies even though she never saw any training records and had no knowledge of what training had taken place. [110] She believed that no one took any action against LG to stop him from bullying students but admitted that she never saw LG's disciplinary records.[111]  No one has told Lisa what the school should have done that would have prevented S.A. from getting bullied.[112]  In her opinion, they should have done more when S.A. was in the 4th grade than make LG apologize to S.A and that even though she had no knowledge about what any of the Defendants knew or what steps they had taken to address bullying, they failed to enforce the school Board's anti-bullying policy  and condoned LG's behavior.[113]

S.A.'s school records from R.W. Combs indicate that her "race/ethnicity" is "white".[114] After S.A.'s mother notified Principal Baker that S.A. attempted suicide, an investigation was

---

[106] *Id.*
[107] *Id.,* Allen, p. 114
[108] *Id.,* Allen, p. 115
[109] *Id.,* Allen, p. 121
[110] *Id.,* Allen, pp. 135-137
[111] *Id.,* Allen, p. 122-123
[112] *Id.,* Allen, p. 137
[113] *Id.,* Allen, pp. 139, 141
[114] Exhibit 3, Person Summary Report re "SA"

started to determine whether anyone in the district had any information that SA was having any problems that led to her suicide attempt.   Attached as Exhibit 8 is a copy of the redacted investigation report and e-mails from S.A.'s teachers.   None of the students nor S.A.'s teachers who were interviewed had any knowledge of any bullying and no one had received any report of bullying.  The last day S.A. and LG would have been in class together was May 6 which was six days before S.A.'s suicide attempt.

During the relevant time period, the Perry County Board of Education had in effect a "Bullying/Hazing" policy.[115]  The policy specifically prohibited "lewd, profane or vulgar language" or "behaviors such as hazing, bullying, menacing, taunting, intimidating, verbal or physical abuse of others or other threatening behavior".  It defined "bullying" as any unwanted verbal, physical or social behavior among students that involves a real or perceived power imbalance and is repeated or has the potential to be repeated, that occurs on school premises or on school sponsored transportation or school sponsored events that disrupts the educational process.  It mandates that bullying be reported and requires employees to take reasonable and prudent action to respond to those reports.

## PROCEDURAL HISTORY

Plaintiff filed suit on August 31, 2021.[116] On Oct. 4, 2021, Defendants filed their Answer asserting the affirmative defenses of sovereign, qualified and official governmental immunity.[117] On 11/2/21, a Scheduling Order was entered setting a discovery deadline for July 1, 2022 and a dispositive Motion Deadline for Sept. 1, 2022.[118]  Plaintiff has taken no discovery nor has she identified any expert witness who will testify that the Defendants were negligent or violated any

---

[115] Exhibit 7, Policy # 09.422
[116] Transcript of Record (TR) 6:21-cv-00149, Doc. #1 page ID #s 1-9
[117] *Id.,*  Doc. # 5, page ID #s 31-35
[118] *Id.,*  Doc. # 10, page ID #s 54-61

clearly established law and her deadline for doing so has lapsed.  This case is now ripe for consideration of Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[119]  "[T]he burden on the moving party may be discharged by showing that there is an absence of evidence to support the nonmoving party's case."[120]  Once the movant has satisfied this burden, the nonmoving party must present affirmative evidence in order to defeat a properly supported motion for summary judgment.[121] The nonmoving party cannot rest on mere allegations, but must set forth specific facts through affidavits or other evidence.[122]  The nonmoving party must create more than a "meta-physical doubt" that summary judgment should not be granted.[123]

I.  **There are no material issues of fact that Defendants were grossly negligent for failing to enforce a Perry County School Board anti- bullying policy.**

In Count I of her Complaint, Plaintiff alleges that S.A. attempted suicide on May 12, 2021 because the Defendants were "grossly negligent, careless, reckless, willful" and that the negligent acts of "Defendants Jett and Baker and Defendant's agent and or employee" violated "the laws of the Commonwealth of Kentucky".  In response to an interrogatory asking her to describe every instance of "harassment and bullying in violation of state law and Board policy" to which S.A. was subjected while she was a student at R.W. Combs Elementary, Plaintiff identified one incident when SA was in the 4th grade and referenced "5th grade NTI" and "6th

---

[119] Fed. R. Civ. P. 56(c); *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 247 (1986)
[120] *Celotex Corporation v. Catrett*, 477 U.S.  at p. 325
[121] *Anderson v. Liberty Lobby, Inc.* 477 U.S. at p. 257
[122] *Lujan v. Nat'l Wildlife Fed'n* 497 U.S. 871, 884-885 (1990)
[123] *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.* 475 U.S. 574, 586-587 (1986)

grade-called a retard lover, 'smelled like a Mexican', Blacks smell like Mexicans and a reference to her being a 'beaner'".[124]  In response to an Interrogatory asking Plaintiff to identify the dates and form of communications that S.A.'s parents used to ask the Principal of R.W. Combs to intervene and stop the bullying and harassment of S.A, she referenced the episode when S.A was in the 4th grade but she could not recall the date.[125]  When Lisa Allen was deposed, she testified that she never reported that S.A had been bullied to anyone in the Perry County School District. She described the incident when S.A. was in the 4th grade and she had been contacted by Ms. Dunn, who advised that S.A had been in the principal's office after she was found crying at school because LG had called her names. Ms. Dunn told Lisa that LG was sent to the principal's office and was asked to apologize to S.A and that his parents were contacted. Lisa verified that LG contacted S.A. on X-Box and apologized and that S.A. accepted his apology.

S.A.' s alleged suicide attempt on May 12, 2021 occurred over 2 years after Ms. Dunn called Lisa to tell her that S.A. had been to the principal's office and reported that LG called her names.  During that more than two year timeframe, no one in the Perry County School District had received any information that LG had bullied S.A. or called her names, much less that the name calling was persistent and interfered with her academic progress.  There is no suggestion, much less evidence, that SA's suicide attempt had anything to do with what happened when she was in the 4th grade.  Since it is uncontroverted that no one reported that LG bullied or called S.A. names in the more than two years since Ms. Dunn and Principal Baker had intervened when S.A. was found crying at school when she was in the 4th grade, there is no evidence that the Defendants had anything to investigate and/or stop. Without any evidence that Defendants had any reason to know that LG was bullying S.A. after he had apologized to S.A. back in the 4th

---

[124] Exhibit 9, Plaintiff's answer to Defendants' Interrogatories, Interr. No. 11
[125] *Id.*, Plaintiff's answer to Defendants' Interrogatories, Interr. No. 12

grade, there are no material issues of fact that they were negligent, much less grossly negligent, for failing to investigate and intervene to stop that bullying. Even if there are issues of fact, Defendants are immune from liability for state law negligence on the basis of sovereign and/or qualified immunity under Ky. law.

## GOVERNMENTAL IMMUNITY UNDER KY. LAW

The Commonwealth of Kentucky and its political subdivisions are immune from liability in tort pursuant to Section 231 of the Kentucky Constitution.  That same immunity is granted to state agencies which perform governmental functions.[126]  Absent a waiver of that immunity, a county official has the same absolute or sovereign immunity for torts allegedly committed by him or her when sued in his or her official capacity.[127] The Perry County Board of Education is an agency that performs governmental functions and is, therefore, entitled to the defense of sovereign immunity.  That same immunity applies to Defendants Jett, Baker and Watts, in their Official capacities.

When an officer or employee of the state or county (or one of its agencies) is sued in his or her individual capacity, that officer or employee enjoys qualified official immunity, which affords him or her protection from damages liability for good faith judgment calls made in a legally uncertain environment.[128] Qualified official immunity applies where the act performed by the official or employee is *discretionary* in nature—an act involving the exercise of discretion and judgment—as opposed to *ministerial* in nature—an act that requires only obedience to the orders of others.[129] Qualified official immunity shields individual state actors from personal liability so long as the individual was performing a discretionary governmental duty that

---

[126] *Jenkins v. Independent Schools v. Doe,*
[127] *Jones v. Cross*, 260 S.W. 3d 343, 345 (Ky. 2008)
[128]  *Yanero v. Davis*, 65 S.W. 3d 510, 522 (Ky. 2001); *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010).
[129] *Turner v. Nelson*, 342 S.W.3d 866 (Ky. 2011) (quoting *Haney,* 311 S.W.3d at 240, and *Yanero v. Davis*, 65 S.W.3d at 240).

involved personal deliberation and judgment while acting in the scope of their authority or employment.[130]   As employees of the Perry County School Board, Defendants Jett, Baker and Watts are government employees who are entitled to the protection of qualified official immunity for their discretionary acts. In this case, Plaintiff alleges that Defendants were grossly negligent for failing to enforce a Perry County School Board policy that prohibits bullying and that Jett and Baker failed to implement that policy and failed to train and supervise the staff at R.W. Combs on that policy. Since Plaintiff's allegations involved discretionary conduct, even if there was an issue of fact as to their liability, they are immune based on qualified governmental immunity.

In *Patton v. Bickford,*[131]  school personnel were sued for failing to enforce school rules that prohibited bullying after a student committed suicide allegedly because he was bullied.  As in this case, the school district at issue had a specific policy that prohibited bullying but unlike this case, there was evidence that school personnel had knowledge that the policy had been violated and failed to intervene. The school personnel had filed a motion for summary judgment on the basis of qualified immunity and in affirming the denial of that Motion, the Ky. Supreme Court ruled that the duty to report was a ministerial function and there was an issue of fact as to whether those reports had been made which defeated the defense of qualified immunity.[132]   In this case, there is no issue of fact that any reports had been made to any of the Defendants that LG was calling SA names after she was in the 4th grade; there were none.  There is no evidence that any of the Defendants failed to respond to any report that S.A. had been bullied. When S.A. reported to MS. Dunn and Principal Baker that LG had called her names in the 4th grade, they investigated her report and LG was sent to the principal's office, his parents were notified and he

---

[130] *Yanero v. Davis*, 65 S.W. 3d at pp. 522-23 (Ky. 2001).
[131] 529 S.W. 3d 717 (Ky. 2016)
[132] *Id*. at pp. 727-728

was asked to apologize to S.A., which he did.   Since there is no evidence that anyone reported that LG was bullying or calling S.A. names after the 4th grade, none of the Defendants had any reason to know that there was an ongoing problem which required their intervention before SA overdosed on her mother's muscle relaxers in May of 2021. When Lisa Allen called Principal Baker to tell him about S.A's alleged suicide attempt, he promptly opened an investigation to determine if anyone was aware of S.A.'s problems. He found no evidence that anyone at R.W. Combs was aware that S.A. had been bullied by LG and failed to report it or intervene to stop it.

In *Turner v. Nelson[133]*, a teacher was sued following allegations that a student had been sexually abused in her classroom by another classmate.  Even though there was evidence presented that the accused student had abused the student on previous occasions in the teacher's classroom and that the teacher had failed to report that abuse, the trial court granted the teacher's motion for summary judgment on the basis of qualified immunity. On appeal, the Kentucky Supreme Court affirmed that ruling stating that the statute which establishes the duty to report sexual abuse, KRS 620.030(1), only directs reporting by a "person who knows or has reasonable cause to believe that a child is… abused." In the absence of actual or personal knowledge of alleged abuse, the only other basis upon which an individual is required to make a report would be the development of a "reasonable cause to believe" that the student had been abused.[134] **"Making such a determination clearly involves the exercise of discretion."[135]** The Court equated "reasonable cause to believe" that a student had been abused to a judicial decision of probable cause to support an asserted proposition.[136] The Court noted that the doctrine of qualified immunity is intended to protect government officials from second-guessing their good

---

[133] 342 S.W. 3d 866 (Ky. 2011)
[134] *Turner v. Nelson*, 342 S.W.3d 866, 877-878 (Ky. 2011).
[135] *Id.* at p. 877, (emphasis added).
[136] *Id.* at p. 878

faith decisions made in difficult circumstances and determined that **"The essence of reaching a determination as to whether reasonable cause exists would require discretion**."[137]

The Ky. Supreme Court re-affirmed the holding in *Turner v. Nelson* in *Alicia Ritchie and Jane Doe v. Arch Turner, et. al.*.[138] In *Ritchie,* a student alleged that she had been sexually abused by a teacher who had been convicted of multiple counts of sexual misconduct involving middle school and high school students. In addressing whether the school defendants were entitled to qualified immunity for failing to report the teacher, the Court stated that where there is no actual or personal knowledge of sexual abuse, the ultimate determination of whether reasonable cause exists to report a teacher "involves reasonable inquiry into the facts, weighing the credibility of witnesses and then using judgment and experience to reach a decision".[139] The act of determining whether an investigation is required is discretionary rather than ministerial.

In this case, there was no report of any ongoing and persistent bullying of S.A. by LG. None of the individual Defendants had actual or personal knowledge that LG was bullying S.A. and therefore, determining if they needed to intervene to enforce the Board's bullying policy clearly involved the exercise of discretion. Defendants are entitled to judgment as a matter of law on the basis of sovereign and/or qualified governmental immunity for any claims of negligence or gross negligence under state law.

## II.    There are no material issues of fact that Defendants violated KRS 344.280

In Count II of her Complaint, Plaintiff alleges that Defendants violated KRS 344.280.  In response to an interrogatory asking her to describe the basis for this allegation, Plaintiff stated, "Defendant Perry County Schools are public accommodations. The Defendant condoned the harassment and bullying of the Plaintiff. When the child was subjected to harassment and

---

[137] *Turner v. Nelson*, 342 S.W.3d at p. 878 (Ky. 2011)
[138] 559 S.W. 3d 822 (Ky. 2018)
[139] *Id*. at p.837

bullying on her race and national origin, she was denied equal access and enjoyment of the public accommodation."[140]

KRS 344.280 (1) provides:

> It shall be an unlawful practice for a person, or two or more persons, to conspire to retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this Chapter or because he has made a charge, filed a Complaint, testified, assisted or participated in any manner in any investigation or proceeding or hearing under this chapter.

KRS Chapter 344 is also known as the Ky. Civil Rights Statute and KRS 344.040(1), in part, makes it an unlawful practice for an *employer* to:

(a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, sex, age forty (40) and over, because the person is a qualified individual with a disability, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking;

(b) To limit, segregate, or classify employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect status as an employee, because of the individual's race, color, religion, national origin, sex, or age forty (40) and over, because the person is a qualified individual with a disability, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking;

To prove a prima facie case of retaliation under KRS 344.280(1), Plaintiff must demonstrate that she was engaged in a protected activity, that she was subjected to adverse

---

[140] Exhibit 9, Plaintiff's answer to Defendants Interrogatories, Interr.  No. 17

treatment and that there was a causal connection between the activity in which the engaged and the adverse treatment to which she was subjected.[141]   It is unclear what protected activity Plaintiff is alleging she engaged in for which she was subjected to retaliation. Her Interrogatory answer certainly does not explain the basis for her KRS 344.280 allegation.  It is uncontroverted that neither S.A. nor her parents ever reported that S.A. had been a victim of discrimination on the basis of her race or national origin.  There is no evidence that S.A. was subjected to any adverse treatment by the Defendants for opposing discrimination.

If Plaintiff is claiming that she was subjected to discrimination on the basis of her race and national origin because LG  called her "beaner" and "border hopper", she never reported it and therefore, she never opposed a practice that KRS Chapter 344 prohibited for which she could have been subjected to retaliation.   KRS 344. 280 liability arises in the employment context as it prohibits an employer from discriminating against its employees.   Plaintiff was never an employee of the Perry County School District.  On the one occasion that S.A. was brought to the principal's office after she was found crying at school when she was in the 4th grade, she reported that LG called her names and Ms. Dunn and Principal Baker intervened to counsel LG, notify his parents and insure that he apologized to S.A.   Neither S.A nor her parents ever reported that the name calling continued after S.A.'s 4th grade year.  There is no evidence that S.A was a victim of retaliation, much less that she was subjected to retaliation for reporting that she had been a victim of discrimination on the basis of her race or national origin. Even if there was some evidence, Defendants are immune from liability on the basis of sovereign and/or qualified immunity.

### III.   Plaintiff's IIED claim is subsumed into her other causes of actions and even if it is not, there are no material issues of fact that Defendants are liable for IIED

---

[141] *Kentucky Dept. of Corrections v. McCullough,* 123 S.W.3d 130, 133-134 (Ky. 2003).

In her Complaint, Plaintiff alleges that Defendants retaliated against her in violation of KRS 344.280, and that they violated her Constitutional Rights by denying her equal protection under the law pursuant to 42 USC § 1983 and 42 U.S. C. § 2000(d), both of which allow for damages for emotional distress.[142]   She also alleges that Defendants are liable for the tort of Intentional Infliction of Emotional Distress ("IIED") which, pursuant to Ky. law, seeks damages for extreme emotional distress.[143]   Plaintiff cannot, as a matter of law, recover emotional distress damages under KRS 344.280 and/or 42 U.S.C. § 1983 and 42 U.S. C. § 2000(d), and for the tort of IIED because, "Where the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute."[144]   Thus, S.A.'s IIED claim is subsumed by her other statutory claims.[145]

Even if S.A.'s IIED claim against Defendants is not subsumed by her other statutory claims, Defendants are still entitled to summary judgment because she has failed to cite *any* conduct on the part of Defendants sufficient to establish IIED.  The tort of outrage or IIED was recognized by the Kentucky Supreme Court in the case of C*raft v. Rice.*[146]   To prove IIED, Plaintiff must establish that Defendants engaged in conduct that was intentional or reckless; that the conduct was outrageous and intolerable in that it offends against the generally-accepted standards of decency and morality and that there was a causal connection between Defendants' conduct and the emotional distress that S.A. allegedly suffered, which must be severe.[147]   It is unclear exactly what conduct Plaintiff claims to support her IIED claim since it is undisputed

---

[142] See *Asbury University v. Powell,* 486 S. W. 3d 246 (Ky. 2016) where the Ky. Supreme Court upheld an award for emotional distress damages in a case involving KRS 344.280 retaliation;  *Chatman v. Slagle,* 107 F. 3d 380, 384 (6th Cir. 1997) in which the Sixth Circuit Court of Appeals upheld an award of non-physical injury damages in a 1983 Civil Rights action
[143] *Rigazio v. Arch Diocese of Louisville,* 853 S. W. 2d 295, 299 (Ky. App. 1993)
[144] *Grzyb v. Evans,* 700 S.W. 2d 399, 401 (Ky. 1995)
[145] *Messick v. Toyota Motor Manufacturing, Kentucky, Inc.* 45 F. Supp 2d 578, 582 (E. D. Ky. 1999)
[146] 671 S.W. 2d 247 (Ky. 1984)
[147] *Miracle v. Bell County Emergency Medical Services,* 237 S.W. 3d 555, 560 (Ky. App. 2007)

that neither she nor her parents ever reported to any of the Defendants that S.A. was a victim of bullying, much less bullying on the basis of any protected classification. S.A. does not know Supt. Jonathan Jett and she testified that she never told him that she had been bullied.  She admitted that she never told Principal Baker that she had been bullied. She claims that she tried to tell Ms. Watts but that she was prevented from doing so.  That perception is inaccurate.   S.A. testified that the only time she went to talk to Ms. Watts about "bullying" was when she accompanied a friend to see Ms. Watts after LG allegedly called the friend a "whore".  When Ms Watts asked S.A. if she was there to discuss anything that had to do with her, she said nothing, at which point Ms. Watts sent her away while she interviewed her friend.  There is no evidence that Ms. Watts had any reason to know that SA had been called names or bullied.  S.A. could have told Ms. Watts that LG was calling her names but she did not.  There is no evidence that any of the Defendants had any reason to know that SA had been bullied because she is Hispanic and failed to intervene.  On the one occasion Defendant Baker was informed that LG called S.A. names when they were in the 4th grade, he investigated and intervened to stop it.  No one reported that the name calling continued and therefore, Baker had no way of knowing that any further intervention on his part was needed.

There is no evidence that any of the Defendants subjected SA to the kind of treatment sufficient to support a claim of IIED. Even if there was, Defendant Perry County Board of Education is entitled to summary judgment as a matter of law on the basis of sovereign immunity and Defendants Jett, Baker and Watts are entitled to judgment as a matter of law on the basis of qualified governmental immunity.

### IV.       The Record Does Not Support Plaintiff's Federal Law Claims.

### A.       Substantive Due Process Violations Brought under 42 U.S.C. § 1983.

Plaintiff alleges Defendants BOE of Perry County, Jett, and Baker violated her substantive due process rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. She brings these claims under 42 U.S.C. § 1983.

To establish a § 1983 claim, Plaintiff must prove the deprivation of a constitutional right caused by someone acting under color of state law.[148] Generally, "a State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause."[149] Courts do, however, recognize three exceptions to this general rule, including the "state-created danger" exception, the "special relationship" exception, and the "shocks the conscience" exception.[150]

### State-Created Danger

To establish a claim under the "state-created danger" exception, Plaintiff must demonstrate:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.[151]

Merely failing to act in the school bullying context is not sufficient to prove an affirmative act.[152] "Failing to punish students, failing to enforce the law, failing to enforce school policy, and

---

[148] *McQueen v. Beecher Cnty. Sch.,* 433 F.3d 460, 463 (6th Cir. 2006).

[149] *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197 (1989).

[150] *Meyers v. Cincinnati Board of Education,* 343 F.Supp.3d 714, 723 (S.D. Ohio 2018).

[151] *Jones v. Reynolds,* 438 F.3d 685, 690 (6th Cir. 2006) (quoting *Cartwright v. City of Marine City,* 336 F.3d 487, 493 (6th Cir. 2003)).

[152] *Stiles ex rel. D.S. v. Grainger Cty., Tenn.,* 819 F.3d 834, 854-55 (6th Cir. 2016).

failing to refer assaults to [the school resource officer] are plainly omissions rather than affirmative acts."[153]

Although Plaintiff alleged in her Complaint that "Defendant" had knowledge that she was subjected to racially-motivated bullying by another student but failed to act sufficiently to correct and prevent that behavior, thereby creating a hostile school environment that deprived S.A. of meaningful access to educational programs and opportunities, those allegations involve omissions, not affirmative acts. In this case, it is uncontroverted that the Perry County Board of Education had a policy that not only prohibited bullying like the conduct to which S.A. alleges she was subjected by another student at R.W. Combs, it also identified a mechanism for reporting bullying which mandated a response from school personnel who received a report. Factually, the evidence demonstrates that Plaintiff's allegations are not true but even if they were, she has failed to raise any material issue of fact to prove that her federal claims fall within the "state-created danger" exception.

### *Special Relationship*

Under certain circumstances, a plaintiff can prove a due process violation pursuant to § 1983 if a special relationship existed between her and the parties she claims violated her rights. Under this theory, certain special relationships created or assumed by a state actor may give rise to an affirmative duty to protect a plaintiff from harm inflicted by a private actor.[154] Generally, however, the special-relationship doctrine is limited to "incarceration, institutionalization" or other similar circumstances in which personal liberty is restrained."[155]

The only evidence in this case of a special relationship is that S.A. was a student enrolled in the Perry County school district, but compulsory school attendance laws do not create a

---

[153] *Id.*
[154] *Soper v. Hoben,* 195 F.3d 845, 852 (6th Cir. 1999) (citing *DeShaney,* 489 U.S. 189).
[155] *DeShaney,* 489 U.S. at 200, 201 n.9.

special relationship giving rise to constitutional duties.[156] Since *DeShaney,* every federal circuit court to address the issue has determined that no special relationship exists between students and school administrators.[157] Thus no constitutional duties arise from the school-student relationship.

### *Shocks the Conscience*

Substantive due process protects individuals from "government actions that 'shock the conscience.'"[158] "Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'"[159] Actions that shock the conscience are so offensive and brutal that they fail to comport with traditional notions of fair-play and decency.[160]

In this case, it is uncontroverted that there was only one occasion in which the staff at R.W. Combs was made aware that LG had called S.A. derogatory names based on her Hispanic heritage and that was when she was in the 4th grade. Ms. Dunn, who is not a party to this lawsuit, and Principal Baker met with L.G. and his parents and instructed him to apologize to S.A. LG did apologize to S.A. over Xbox Live and according to her mother, she accepted that apology. Both S.A and her mother admitted that this was the only occasion that anything was reported to any of the Defendants about LG bullying S.A.  S.A. admitted that when she was in the in fifth and sixth grades, Principal Baker addressed her class about bullying. After Lisa Allen reported to Principal Baker that S.A had attempted suicide, he immediately began an investigation to determine if anyone knew of issues between S.A. and LG which may have contributed to her alleged suicide attempt.  This is hardly behavior on the part of the Defendants that "shocks the conscience" or which is so offensive and brutal that it violates traditional ideas of fair-play and

---

[156] *Soper,* 195 F.3d at 853.
[157] *See, e.g., Id.* at 852; *Stiles,* 819 F.3d at 854; *K.B. v. Waddle,* 764 F.3d821, 824 (8th Cir. 2014); *Doe ex rel. Magee v. Covington City Sch. Dist. ex rel. Keys,* 675 F.3d 849, 856 (5th Cir. 2012 (en banc); *Patel v. Kent Sch. Dist.,* 648 F.3d 965, 973 (9th Cir. 2011).
[158] *Range v. Douglas,* 763 F.3d 573, 588 (6th Cir. 2014).
[159] *Id.* (citing *City of Sacramento v. Lewis,* 523 U.S. 833, 846-47 (1998)).
[160] *Id.* at 589-90.

decency. In short, Plaintiff has not, and cannot, under the facts alleged, carry her burden of proving a due process violation sufficient to sustain a private cause of action under § 1983.

### B.     Equal Protection Violation

Plaintiff next alleges that the Defendants violated S.A.'s equal protection rights. "The Sixth Circuit recognizes two methods of proving an equal protection violation based on a school official's response to peer harassment: (1) disparate treatment of one class of students who complain about bullying as compared to other classes of students…and (2) deliberate indifference to discriminatory peer harassment."[161] In other words, a plaintiff must show the defendants intentionally discriminated or acted with deliberate indifference to the harassment.[162]

Under the disparate treatment theory, a student of a particular national origin or race must produce evidence that her complaints of peer harassment were treated differently by school officials than complaints made by students of different national origins or races.[163] A plaintiff claiming discrimination on the basis of actual or perceived national origin or race must show that she was treated differently from students who were not, or not perceived to be, a member of the same race or national origin.[164]

Plaintiff has introduced no such evidence. The Defendants responded to the one complaint they actually received that LG bullied S.A. by calling her "beaner" and "border hopper". There is no evidence that the Defendants treated similar complaints by students of different racial backgrounds differently.

---

[161] *Stiles,* 819 F.3d at 851-52.
[162] *Shively v. Green Local Sch. Dist. Bd. of Educ.,* 579 Fed.Appx. 348, 357 (6th Cir. 2014).
[163] *Soper,* 195 F.3d at 852 (*Soper's* analysis is through the lens of sex-based discrimination, but the analysis would be the same for race-based discrimination).
[164] *Stiles,* 819 F.3d at 852 (again, while *Stiles* analyzes an equal protection violation in the context of sex-based discrimination, the analysis would be the same for race-based discrimination).

Having failed to introduce evidence of intentional discrimination, in order to raise a material issue of fact that she was denied equal protection sufficient to overcome Defendants' Motion for Summary Judgment, Plaintiff must establish that Defendants displayed deliberate indifference to her harassment. To show deliberate indifference in the context of a § 1983 equal protection violation, a plaintiff must first offer evidence that she was actually subjected to discriminatory peer harassment,[165] and that she, in fact, was harassed by other students based on [her] race."[166] To be actionable, the harassment must be severe, pervasive, and objectively offensive.[167] Finally, a plaintiff must offer evidence that the defendants responded to this severe, pervasive peer harassment with deliberate indifference, in a manner clearly unreasonable in light of known circumstances.[168]

According to S.A., the student troublemaker in question harassed her and other students on grounds other than race, calling into question whether his motive was racial discrimination or just general harassment of his classmates. Although S.A. claims that LG repeatedly called her names over a 3 year period, she never produced any evidence to support that claim. She did not produce copies of social media postings in which she was called derogatory names based on her race or national origin. She could not identify any dates in which the name calling occurred. Although referring to S.A. as a "beaner" and referencing the former President's plan to build a wall along the U.S. border with Mexico may be offensive, there is no actual evidence that those comments were severe and pervasive. But, even assuming they were sufficiently severe, it is uncontroverted that Principal Baker and Ms. Dunn investigated the matter when it came to their attention. If there were other instances of name calling, they were unknown by Defendants as

---

[165] *Id.* (citing *Williams v. Port Huron Sch. Dist.,* 455 Fed.Appx. 612, 618 (6th Cir. 2012); other citations omitted).
[166] *Id.* (quoting *DiStiso v. Cook,* 691 F.3d 226, 241 (2d Cir. 2012)).
[167] *Port Huron Sch. Dist.,* 455 Fed.Appx. at 618.
[168] *Shively,* 579 Fed.Appx. at 357.

they were never reported and occurred outside school hours on gaming devices or other means over which the school had no authority. This scant evidence hardly paints a picture of deliberate indifference that is clearly unreasonable in light of the known circumstances. A school administrator cannot remedy what he doesn't know to occur. There are no material issues of fact that SA was denied equal protection claim by Defendants and they are entitled to judgment as a matter of law.

### C.      Title VI Claims

Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[169] To sustain a student-on-student harassment claim under Title VI, a plaintiff must show "(1) the harassment was so severe, pervasive, and objectively offensive that it could be said to deprive [plaintiffs] of access to the educational opportunities or benefits provided by the school; (2) [defendants] had actual knowledge of the harassment; and (3) [defendants were] deliberately indifferent to the harassment."[170]

#### *Harassment*

"In determining whether the alleged harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived plaintiffs of access to educational opportunities, courts look to the nature, frequency, and duration of the harassment, as well as its effect on the

---

[169] 42 U.S.C. § 2000d; Civil Rights Act of 1964, Pub.L., No. 88-352, § 601, 78 Stat. 241, 252.

[170] *Brooks v. Skinner,* 139 F.Supp.3d 869, 882 (S.D. Ohio 2015) (quoting *Muslin v. Tennessee State Univ.,* 665 F.Supp.2d 922, 931 (M.D. Tenn. 2009)). Both of the cases restate the test set forth by the Supreme Court in *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629 (1999). *Davis* formulated this standard for Title IX claims premised on gender-based peer harassment, as opposed to race-based harassment. But the substantive provisions of Title IX and Title VI mirror each other, and courts apply case law interpreting the two statutes interchangeably. *See, e.g., Grove City Coll. v. Bell,* 465 U.S. 555, 566 (1984); *Homer v. Ky. Athletic Ass'n,* 206 F.3d 685, 689-92 (6 th Cir. 2000) (discussing how the U.S. Supreme Court has used analytical framework of Title VI cases to interpret Title IX).

victim."[171] In making this determination, it's also important to remember that children "often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct...."[172] "Damages are not available for simple acts of teasing and name-calling among school children...."[173]

In this case, S.A. identified incidents that occurred during S.A.'s fourth, fifth, and sixth grade years in which one particular student called her a "beaner" and/or a "border-hopper" and on one occasion, said that S.A. shouldn't have to answer a particular question because she was "Mexican." Some of this harassment happened at school and some of it happened after school hours on Snapchat and Xbox Live. During significant stretches of time during S.A.'s fifth and sixth grade years, the COVID-19 pandemic forced classroom instruction online, which created physical space between L.G. and S.A.

Although terms like "beaner" and "border-hopper" may be considered racial slurs which are more than mere teasing or name-calling, it is also important to consider the severity and frequency of the name calling.[174] S.A. testified that she was called derogatory names other than those related to her race or national origin. S.A. admitted she did not report LG's repeated name calling because she still considered him a friend. When S.A. and her mother learned that LG had transferred to the same new school where S.A. transferred for seventh grade, she chose to transfer anyway, even though she could have stayed in the Perry County Schools and avoided LG. This does not paint a picture of harassment so severe, offensive, and pervasive that it is actionable under Title VI.

---

[171] *Brooks,* 139 F.Supp.3d at 882.
[172] *Davis,* 526 U.S. at 651.
[173] *Id.*at 652.
[174] *Brooks,* 139 F.Supp.3d at 882.

In *Pahssen v. Merrill Comm. Sch. Dist.,*[175] for instance, three separate incidents of alleged sexual harassment—a male student shoving a female student into a locker, demanding that she perform oral sex on him, and making obscene sexual gestures at her—did not constitute sexual harassment that rose to the level of "severe, pervasive, and objectively offensive." The harassment here is arguably even milder that the harassment in *Pahssen.* It is not enough to support a Title VI claim.

### Actual Knowledge

More importantly, to sustain a peer-harassment claim against a school defendant, courts have required actual knowledge by the school board, the superintendent, or a school principal.[176] Here, Plaintiff admits that Principal Baker was made aware of only one instance, during S.A.'s fourth grade year, that S.A. being subjected to a racial slur. S.A and her mother admitted that they never reported anything about LG to the Perry County Board of Education nor Superintendent Jett, nor Ms. Watts. Thus, while Principal Baker had actual knowledge of one incident, more than two years before S.A's alleged suicide attempt, by Plaintiff's own admission, he had no actual knowledge that such harassment was ongoing, severe, or pervasive. Without this actual knowledge, Plaintiff's Title VI claim must fail.

### Deliberate Indifference

Even if there is an issue of fact that LG's harassment of S.A. while she was a student at R.W. Combs was sufficiently pervasive and severe and that Principal Baker had sufficient actual knowledge of that harassment, Plaintiff's claims fail completely because there is no evidence that Defendants displayed deliberate indifference to what was happening to S.A..

---

[175] 668 F.3d 356, 363 (6th Cir. 2012)
[176] *Id.* at 883 (citing *Davis v. DeKalb Cty. Sch. Dist.,* 233 F.3d 1367, 1371 (11th Cir. 2000); *Vance v. Spencer Cty. Pub. Sch. Dist.,* 231 F.3d 253, 258 (6th Cir. 2000); *Doe v. Dallas Indep. Sch. Dist.,* 220 F.3d 380, 384 (5th Cir. 2000)).

Deliberate indifference is seen in cases "where officials of a recipient entity with authority to take corrective action, having been advised of a Title [VI] violation, decide not to remedy the violation."[177] "[A] plaintiff may demonstrate [a] defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'"[178] In measuring the reasonableness of the response, courts must look to the totality of the circumstances as opposed to reviewing each reported incident, standing alone.[179] Courts must also avoid second-guessing school administrators' disciplinary decisions.[180]

Here, in response to the one reported incident of LG calling S.A. names which happened more than two years before S.A's alleged suicide attempt, Principal Baker called L.G. to his office, investigated the complaint and took action by counseling the student, notifying his parents and asking the student to apologize to S.A. He subsequently spoke to SA's 5th and 6th grade classes about bullying. From his perspective, having heard no further reports from S.A. or her mother, Baker had not reason to know that the name calling continued. And, because much of this harassment occurred after school hours, during periods where students were learning remotely, he had no reason to suspect that the harassment continued.

Plaintiff has not identified any expert who will opine that the Perry County School Board's policy against bullying was deficient or that the steps that were taken by Defendants when they learned that LG had called SA a "beaner" or "border hopper" were deficient in any way. There is no evidence that Defendants exhibited the level of indifference sufficient to

---

[177] *McCoy v. Bd. of Educ., Columbus City Sch.*, 515 Fed.Appx. 387, 391 (6th Cir. 2013) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S.274, 290-91 (1998).
[178] *Brooks*, 139 F.Supp.3d at 883 (quoting *Vance*, 231 F.3d at 260).
[179] *Id.* at 884.
[180] *Stiles*, 819 F.3d at 848 (quoting *Davis*, 526 U.S. at 648).

support a Title VI claim. Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiff's Title VI claim.

### D.     Defendants are entitled to Qualified Immunity under federal law.

Even if the Court is not persuaded by the foregoing arguments, Defendants are entitled to judgment as a matter of law on the basis of qualified immunity from Plaintiff's federal-law claims. Under federal law, qualified immunity shields government officials who are performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[181] Qualified immunity is "immunity from suit rather than a mere defense to liability."[182] "[I]t protects all but the plainly incompetent or those who knowingly violate the law."[183] Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonable misapprehends the law governing the circumstances she confronted."[184] The "reasonableness" of the alleged offender's conduct must be judged by the law at the time of the conduct and if the law did not clearly establish that the alleged offender's conduct violated the U.S. Constitution, he or she cannot be subject to liability.[185]

To overcome the defense of qualified immunity, a plaintiff must establish "facts" showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."[186] "A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is

---

[181] *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).
[182] *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).
[183] *Malley v. Briggs,* 475 U.S. 335, 341 (1986).
[184] *Lyons v. City of Xenia,* 417 F.3d 565, 578-79 (6th Cir. 2005)
[185] *Brossseau v. Haugen,* 543 U.S. 194 (2004)
[186] *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011) (internal quotation marks omitted).

doing violates that right."[187] "[E]xisting precedent must have placed the statutory or constitutional question beyond debate."[188] Also, qualified immunity must be assessed in the context of each individual's specific conduct."[189]

Defendants have already established that they were engaged in a discretionary function in responding to the one report that S.A had been called "beaner" and "border hopper" by another student when she was in the 4th grade. Both S.A. and her mother testified that they never reported any racial or national origin harassment to Superintendent Jett, the Perry County Board of Education nor Ms. Watts and Plaintiff has introduced no evidence to even suggest that any of the Defendants knew that LG continued to call S.A. names after she was in the 4th grade.  As for Principal Baker, as previously discussed, he could not have known that he was violating S.A's clearly-established Constitutional Right because she never made him aware that   LG was calling her derogatory names based on her race and national origin after the 4th grade and specifically in the time frame around her alleged suicide attempt.

Finally, it is far from settled that a plaintiff can even maintain a cause of action under Title VI under the circumstances of this case. While courts have recognized a cause of action under certain circumstances for a Title IX claims for peer harassment, neither the U.S.  Supreme Court nor the Sixth Circuit Court of Appeals have explicitly recognized a Title VI claims for peer harassment and those cases in which U.S. district courts have recognized such a cause of action in Title IX cases involve evidence that is far more severe than the facts alleged in this case.   Clearly, the individual Defendants are entitled to judgment as a matter of law on the basis of qualified immunity.

---

[187] *Id.* at 741.
[188] *Id.*
[189] *Stoudemire v. Mich. Dep't of Corrections,* 705 F.3d 560, 570 (6th Cir. 2013).

IV.   **Defendants are entitled to judgment as a matter of law on the basis of the Paul D. Coverdell Teacher Protection Act**

20 U.S.C. § 7941 is known as the Paul D. Coverdell Teacher Protection Act of 2001. § 7942 of that statute describes its purpose as providing teachers, principals and other school personnel the tools they need to undertake reasonable actions to maintain order, discipline and or an appropriate educational environment.  § 7946(a) provides, in part, that no teacher shall be liable for harm caused by an act or omission of the teacher on behalf of  a school if; (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity; (2) the actions of the teacher were carried out in conformity with Federal, State and local laws in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school; (3) if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities; (4) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher.  "Teacher" is defined to include not only teachers but principals and administrators and employees of a Board of Education.[190]

In this case, as previously established, the individual school Defendants implemented policies to prohibit bullying, including bullying based on a protected classification at R.W. Combs Elementary; they discussed that policy with S.A's class on multiple occasions; and they investigated a report that S.A. had been called names by another student and intervened to counsel that student and notify his parents.  They were acting within their authority as employees

---

[190] 20 U.S. C. § 7943(6)

of the Perry County School Board and pursuant to state and federal law. Plaintiff has produced no evidence that any of them acted willfully or with flagrant indifference to S.A's rights or her safety.  Therefore, even if there were issues of fact regarding Plaintiff's allegations against them, they are entitled to judgment as a matter of law   pursuant to 20 U.S.C. § 7946.

## CONCLUSION

There are no material issues of fact that Defendants were negligent or grossly negligent for failing to address bullying based on Plaintiff's race or national origin when neither she nor anyone else reported it to them.  There are no material issues of fact that Defendants retaliated against the Plaintiff for opposing any practice that is made unlawful under the Kentucky Civil Rights Act.   There are no material issues of fact that Defendants intentionally inflicted emotional distress on the Plaintiff but even if there was, that cause of action is subsumed into Plaintiff's other causes of action and therefore, that claim should be DISMISSED.  Even if there are material issues of fact relating to Plaintiff's state law claims, Defendants are entitled to judgment as matter of law on the basis of sovereign and/or qualified governmental immunity. There are no material issues of fact that Defendants violated Plaintiff's Fourteenth Amendment Due Process rights or that they denied the Plaintiff equal protection under the law.  Even if there were, Defendants are entitled to judgment as a matter of law on Plaintiff's federal law claims on the basis of qualified immunity or the Paul D. Coverdell Teacher Protection Act of 2001. Wherefore, for the reasons outlined herein, the Court is respectfully requested to GRANT Defendants summary judgment and to DISMISS this case in its entirety.

Respectfully submitted,


Jonathan C. Shaw
Porter, Banks, Baldwin & Shaw, PLLC
327 Main Street
P.O. Drawer 1767
Paintsville, KY 41240-1043
(jshaw@psbb-law.com)

and

Barbara A. Kriz, Esq. (KBA #81186)
(bkriz@kjpjlaw.com)
Christopher S. Turner (KBA #89072)
(cturner@kjpjlaw.com)
**KRIZ, JENKINS, PREWITT & JONES, P.S.C.**
200 West Vine Street, Suite 710
P.O. Box 499
Lexington, Kentucky 40588
Telephone:  (859) 255-6885
Facsimile:  (859) 253-9709


By:    /s/ Barbara A. Kriz
       *Counsel for Defendants*


## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that this Pleading was filed electronically on this 1st day of September, 2022, and served electronically via the Court's CM/ECF system, to counsel of record named below:


Edward E. Dove, Esq.
201 W. Short Street
Suite 300
Lexington, KY 40507
e-mail:  (eddove@windstream.net)


*/s/ Barbara A. Kriz*