UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| S.A., a minor by and through her parents and Next Friends, W.A. and L.A., | ) ) ) ) | |
| | ) | Civil Action No. 6:21-CV-149-CHB |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **MEMORANDUM OPINION AND ORDER** |
| BOARD OF EDUCATION OF PERRY COUNTY, KENTUCKY, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by the Defendants.[1] [R. 25]. Plaintiff S.A., a minor, by and through her parents and next friends, W.A. and L.A., responded, and the Defendants replied. [R. 28; R. 29]. The matter is ripe for review. For the reasons that follow, the Defendants' motion will be **GRANTED** in part and **DENIED** in part.

## I.    Background

S.A. filed her Complaint in this action on August 30, 2021. [R. 1]. The facts discussed below are primarily drawn from the depositions of S.A. [R. 25-2] and her mother, L.A. [R. 25-3].

---

[1] The Defendants in this action are the Board of Education of Perry County, Kentucky; Jonathan Jett, Perry County superintendent, in his individual and official capacities; Josh Baker, principal at R.W. Combs Elementary School, in his individual and official capacities; and Krystal Watts, a teacher at R.W. Combs Elementary, in her individual and official capacities. *See* [R. 1, p. 2]; *see also* [R. 5]. The Court will refer to the Defendants collectively as "Defendants" and by individual name as necessary for clarity.

At the time her Complaint was filed, S.A. was a 12-year-old student.  [R. 1, p. 2 ¶ 6].  S.A.'s deposition was taken in June 2022.  *See* [R. 25-2, p. 2].  During her deposition, S.A. testified that she had attended R.W. Combs Elementary since before kindergarten through sixth grade, which she completed in the spring of 2021.[2]  *Id.* at 11-12.[3]  While S.A. was a student at the school, she was bullied.  *Id.* at 22:6 ("They would call me names and wouldn't leave me alone and just --.").  S.A. is biracial, but said she never told anyone that her biological father was from Mexico, so "[p]retty much" the only way L.G., the student who bullied her, knew anything about her connection to Mexico was because S.A. had curly hair.  *Id.* at 85:8.

According to S.A., the bullying began when she was ten years old, toward the end of her fifth grade year, when L.G., a classmate whom she had attended school with together for years, told her "to shut up and go back to Mexico where [she's] from" and that nobody wanted to hear her talk.  *Id.* at 7, 22:22-23, 24:14-24.  This incident happened outside at recess and made S.A. cry.  *Id.* at 22-28.  Ms. Dunn, a teacher, noticed S.A. was crying and asked S.A. to tell her what happened with L.G.  *Id.* at 26.  Ms. Dunn also talked to L.G. about the incident.  *Id.* at 28.  Thereafter, Ms. Dunn sent L.G. to the principal's office.  *Id.* at 27.  The following day, L.G. told S.A. that he did not get into any trouble.  *Id.* at 28.  Importantly, and according to S.A., this was the sole time— her report to Ms. Dunn at the end of fifth grade—that she ever reported L.G.'s bullying to school officials, explaining that she was embarrassed.  *Id.* at 41:15-18, 44:14-22, 46:11-13.

---

[2] Portions of S.A.'s fifth and sixth grade years were completed remotely due to the pandemic.  *See* [R. 25-3, p. 5].

[3] The transcript from S.A.'s deposition appears in the record at Docket Entry 25-2, and the transcript from L.A.'s deposition appears in the record at Docket Entry 25-3.  Because the transcripts contain four pages of testimony per document page, the Court will cite to the deposition page and line numbers when quoting from the deposition transcripts.

A week after the fifth grade incident, L.G. called S.A. names in class like "ugly, stupid, fat," *id.* at 28:19-29:1, but S.A. did not report L.G.'s behavior to her teacher, *id.* at 29:18-19.  S.A. testified that L.G. also bullied other students and that those students would, on occasion, report the name-calling to their math teacher, Ms. Watts.  *Id.* at 29:15-30:19.   In response to the other students' reports, Ms. Watts told L.G. to stop.  *Id.* at 30:17.   However, S.A. said teachers' comments had no effect on L.G.  *Id.* at 32:23-33:1.  When asked whether the teachers ever heard L.G. call *her* names, S.A. testified, "I don't think so."  *Id.* at 34:12-14.

The next year, in sixth grade, L.G. continued to call S.A. names, including "beaner," but she did not report it.  *Id.* at 44:8-10.  S.A. testified she once tried to report the name-calling to Ms. Watts.  *Id.* at 33-37.  On that occasion, L.G. called S.A. a "border hopper" and called her friend M. a "whore."  *Id.* at 33-35.  M. asked S.A. to go with her to speak with Ms. Watts (apparently because S.A. was a witness).  *Id.* at 34-36.  Although S.A. planned to tell Ms. Watts about L.G. calling her a "border hopper," S.A. says she did not get the chance.  *Id.* at 36.  Instead, when she got to Ms. Watts, Ms. Watts responded, "What does this got to do with you?"; Ms. Watts then told S.A. to "[j]ust go on."  *Id.* at 35:22-23, 36:15-16.  Here, S.A. testified that Ms. Watts "didn't give [her] the chance to" tell Ms. Watts that L.G. had called her a border hopper and beaner.  *Id.* at 36:7, 36:22-23 ("She said it was none of my business and told me to go play.").  S.A. was further questioned:

> Q:  When she said, "It's none of your business," you didn't say, "but he's been calling me names too?"
>
> A:  No.

*Id.* at 36:24-37:1.  S.A. never told Ms. Watts about this incident.  *Id.* at 44:8-10 ("Q: Did you ever report [the incident] to either Ms. Estep or Ms. Watts?  A: No").  She never told her parents either.  *Id.* at 72:17-24.  Ms. Watts did, however, speak with M., but S.A. was unsure whether they

discussed L.G.'s name-calling of S.A.  *Id.* at 43:17-19.  The next day, L.G. called S.A. names

again.  *Id.* at 43:22.  S.A. did not report L.G.'s behavior and instead walked away.  *Id.* at 44:4.

      Sometimes, L.G. would call S.A. names outside of school.  *Id.* at 39-40.  For example, S.A.

and L.G. played games on Xbox.  *Id.* at 39.  During these games, L.G. would call S.A. names,

leading S.A. to turn off her Xbox and not interact with L.G.  *Id.* at 40.  He would also call her

names on Snapchat.  *Id.* at 46.  S.A. testified that she had called L.G. "stupid" while on Xbox,

sometimes in a joking manner and sometimes when she was upset with him.  *Id.* at 40:15-41:1.

However, S.A. never showed any adults the names that L.G. had called her on Xbox or Snapchat.

*See, e.g.*, *id.* at 41:15-18, 40:5-9 ("Q.  Did you tell your parents?  A.  No.  Q.  Why Not?  A.

Because I considered him my friend at the time.").  In their depositions, S.A. and L.A. were

separately asked about any whether any such messages remained on S.A.'s phone.  S.A. testified

her phone was unavailable because she dropped it off the front porch and it broke.  *Id.* at 45, 82-

83.  L.A. testified that many messages had been deleted and that S.A's phone was unavailable

because she dropped it in the lake, specifically S.A. had it in her pocket while jet skiing and it fell

in the lake.  [R. 25-3, pp. 150-51].

      S.A. testified that L.G. would call her a border hopper or beaner every day during sixth

grade.  *See* [R. 25-2, p. 44].  S.A. repeatedly testified, however, that she did not tell any adult at

school or her parents about L.G.'s bullying during sixth grade, including his bullying that occurred

in person or via Xbox or Snapchat:

> Q:  When you would go back to school after the times that L.[G.] would call
> you names on Xbox, would you report that to any adult at the school?
>
> A:  No.

*Id.* at 41:15-18.

> Q:  And at any time during the sixth grade year, did you ever go to anyone and report it at school?
>
> A:  No.
>
> Q.  What about to your parents, did you go home and tell your parents that [L.G.] was calling you a beaner and border hopper every day?
>
> A.  No.
>
> Q:  Why not?
>
> A:  I was embarrassed.

*Id.* at 44:14-22.

> Q:  And did you ever show any adult the names that L.[G.] called you on either Xbox or Snapchat?
>
> A:  No.

*Id.* at 46:11-13.

S.A. also testified that, during her fifth and sixth grade years at R.W. Combs Elementary, Principal Baker would come to her classroom to talk about bullying and the school's anti-bullying policy.  *Id.* at 30:24-31:21.  However, S.A. said she never told Principal Baker about L.G.'s bullying, and she similarly testified that she did not know Superintendent Jett and never reported anything to him related to L.G.:

> Q:  Do you know -- have any -- do you know Jonathan Jett, the Superintendent?
>
> A:  No.
>
> Q:  Did you ever have any discussions with him, about what was happening with you?
>
> A:  No.
>
> Q:  Did you ever report to him, anything related to L.G.?
>
> A:  No.

Q:  Did you ever report directly to Mr. Baker, anything about L.G.?

A:  No.

Q:  So the only one, that you would've told anything to, about L.G., would've been Ms. Watts?

A:  Yes.[4]

Q:  And that was on one occasion, when you went to her about M being called a whore?

A:  Yes.

*Id.* at 77:15-78:7.

As a result of L.G.'s bullying, S.A. began to harm herself in fifth grade. *See, e.g. id.* at 47-48.  S.A. testified that she would cut herself once or twice a week the whole time she was in the sixth grade, but her goal was not to kill herself. *Id.* at 47-50.  She did not tell her parents or anyone at school that she was upset enough to harm herself, and she would hide the marks on her arms from her parents by covering them up. *Id.* at 49.  S.A. did tell a cousin about the self-harm. *Id.* at 51-52.

S.A. testified that she recalled L.G. calling her names and mistreating her online and in person in May 2021. *Id.* at 70.  Tragically, on May 12, 2021, S.A. attempted suicide by taking some of her mother's muscle relaxers. *Id.* at 63-65.  S.A. testified that she had faked going to school that day because Ms. Watts had screamed at her class a few days prior that she was tired about kids' parents calling her because they were being picked on. *Id.* at 56-57.  S.A. felt Ms. Watts's comments were "[i]n a way" directed at her, even though her parents had not contacted Ms. Watts. *Id.* at 57:18-20.

---

[4] As mentioned, S.A. did not actually alert Ms. Watts of L.G.'s behavior. *See supra* p. 3.

Regarding her suicide attempt, S.A. testified that she remembered taking the pills and "[l]aying down," but she did not remember being taken to the emergency room at the hospital in Hazard. *Id.* at 67:5. She did remember being in the intensive care unit at the University of Kentucky before being transferred to Good Samaritan Hospital, where she received mental health treatment. *Id.* at 67. While at Good Samaritan, S.A. told her therapist that she had taken the pills because she "was being bullied pretty bad." *Id.* at 68:12.

After S.A. was discharged from the hospital, she returned to R.W. Combs Elementary for end-of-year testing. *Id.* at 69. She took the tests in Principal Baker's office, but did not talk with him about what had happened with L.G. *Id.* That summer, she decided to transfer schools to Hazard Independent Middle School. *Id.* at 70. S.A. and her parents told Principal Baker that she was transferring because of what L.G. had said to her. *Id.* at 71. Principal Baker told S.A. that L.G. was going to be transferring, too, but S.A. said she still wanted to leave R.W. Combs Elementary because she did not like the teachers there: "They just don't take care of the students like they should."[5] *Id.* at 72:15-16.

S.A. experienced difficulty learning at R.W. Combs Elementary because she did not always understand the material being taught remotely during the pandemic and because L.G.'s behavior was distracting. *Id.* at 76. At the time, S.A. never spoke with her parents about getting distracted with course work, but she did talk to her cousin sometimes about "how [she] was feeling that day." *Id.* at 77:2-6.

The deposition of L.A., S.A.'s mother, was taken in April 2022. *See* [R. 25-3, p. 1]. During her deposition, L.A. testified that she first learned S.A. was being bullied when S.A. was in fourth grade and a teacher (Ms. Dunn) called to say that S.A. might come home upset because she had

---

[5] L.G. also transferred to Hazard Independent Middle School. *See* [R. 25-2, p. 71].

been found in the bathroom crying and was taken to Principal Baker's "office because some little boy had been calling her names."[6]  *Id.* at 36:8-40:25.  When S.A. got home that day, L.A. had a conversation with her about what had happened, and S.A. told L.A. that "[s]ome little boy called her a beaner."  *Id.* at 39:9-10.  L.A. asked what a beaner was, and S.A. told her, "It's me, Mommy. I'm Mexican."  *Id.* at 39:12.  S.A. told her mother that "there was this little boy that always tells her she's a beaner," and that on this particular day, "a couple other boys was laughing and saying the same thing."  *Id.* at 40:13-16.  S.A. mentioned L.G. as being one of the boys.  *Id.* at 40:19-20. S.A. told her mother that she was taken to Principal Baker's office to describe what happened with L.G. and that she was told L.G. would be required to apologize.  *Id.* at 41-42.  L.A. confirmed that, over the weekend following the incident, L.G. apologized to S.A., and S.A. accepted the apology. *Id.* at 43-44.

L.A. called Principal Baker the next week.  *Id.* at 42:9-12 ("Q:  And did you contact Mr. Baker to advise him that an apology was not going to be acceptable, that he needed to do something more?  A.  Yes, ma'am.").  Principal Baker told L.A. what had happened, and L.A. told Principal Baker that L.G. had supposedly apologized over the weekend on Xbox to S.A.  *Id.* at 42-44.  L.A. asked Principal Baker if any more actions were going to be taken because S.A. had informed her that L.G.'s behavior had been happening for a while, including the whole fourth grade year and maybe even into third grade.  *Id.* at 44:12-49:13.  Principal Baker told L.A. that he would further discuss the incident with L.G.  *Id.*  L.A. did not know what steps Principal Baker took after

---

[6] It appears fairly clear that L.A.'s testimony about the fourth grade incident and S.A.'s testimony about the fifth grade incident involve a single incident and one of them incorrectly stated the year.  S.A. repeatedly testified she reported L.G.'s bullying to school officials a single time and that was to Ms. Dunn late in her fifth grade year.  [R. 25-2, pp. 22-27, 41:15-18; 44:14-22; 46:11-13].  However, for purposes of this Motion and because the evidence must be viewed in the light most favorable to S.A., the Court views the testimony as describing two separate incidents, one in the fourth grade as reported by L.A., and one in the fifth grade as reported by S.A.

speaking with her. *Id.* at 49. L.A. also testified that she did not contact L.G.'s parents, *id.* at 54, and that this was the sole time she spoke with Principal Baker (or any other school official) concerning bullying by L.G. *See, e.g.*, *id.* at 121, 126. For the reminder of S.A.'s fourth grade year, S.A. did not report any other issues with L.G. or any other student to L.A. *Id.* at 50-51. Other than this one instance, the next time L.A. learned anything about L.G.'s continued bullying was after S.A. tragically attempted suicide at the end of her sixth grade year. *Id.* at 55, 64, 121-22.

L.A. testified L.G.'s name calling appeared to affect S.A.'s school performance: "She didn't want to go to school anymore. She didn't want to clean up. Her grades would drop." *Id.* at 50:13-14. L.A. would check on S.A., but S.A. told her that she was not having trouble with L.G., so L.A. assumed the issues with L.G. were over during the summer after fourth grade. *Id.* at 50-52. However, L.A. has since learned that S.A. had problems with L.G. that summer, including being called names online. *Id.* L.A. testified that S.A. was afraid to tell L.A. about L.G.'s actions during this time because she was afraid of L.G. and the school system, like having to move schools and leave her friends. *Id.* at 52, 54, 92.

Academically, S.A. did not do well in fifth grade. *Id.* at 64. L.A. blamed S.A.'s poor grades that year on "a combination of a little bit of everything," including "[s]tuff was going on in her life with this little boy" and the stress of attending school remotely during the pandemic. *Id.* at 65:1-12. L.A. testified that she spoke with Principal Baker and Ms. Estep about her concerns regarding S.A.'s performance, and Principal Baker told L.A. that the pandemic had been hard on many students and that they would offer S.A. help. *Id.* at 65-67. L.A. said S.A. did benefit from the extra help. *Id.*

For sixth grade, S.A. attended school in person, which S.A. told L.A. helped her performance. *Id.* at 67. Regarding L.G., L.A. testified that she was not aware of any problems

- 9 -

between S.A. and L.G. the summer before they started sixth grade or during that school year. *Id.* at 62-64. But even though S.A. did not report any problems with L.G. during sixth grade, L.A. knew S.A.'s grades were still poor and observed that her daughter had become more distant. *Id.* at 69. L.A. did not report her daughter's behavior to anyone at R.W. Combs Elementary, and teachers' notes from that year described S.A. as coming "out of her shell." *Id.* at 69-70.

S.A.'s suicide attempt happened at the end of her sixth grade year. *Id.* at 70. L.A. testified that she did not suspect at the time that S.A. had tried to commit suicide. *Id.* at 73-79, 88-89. The ER physician at the Hazard hospital showed L.A. S.A.'s arms and told L.A. that S.A. had tried to commit suicide. *Id.* at 88-89. S.A. was then transported to UK by helicopter, where she was in the ICU before being transferred to Good Samaritan. *Id.* at 77-80. L.A. testified that doctors were not able to say how many pills S.A. had taken, but that there "was a very, very big amount" in her system. *Id.* at 80:17-18. S.A. had written a suicide note before she took the pills, which her family found in her room. *Id.* at 83.

At Good Samaritan, L.A. asked S.A. what had happened, and S.A. began to cry and told L.A. she was sorry and that she did not want to get L.G. or others in trouble. *Id.* 82-83. S.A. then told L.A. about L.G.'s comments and actions during sixth grade, including calling her a beaner or border hopper, telling her that former President Trump would build a wall, and calling her a "retard lover" for trying to stop L.G. from being mean to a friend with autism in her class. *Id.* at 84-85. S.A. told L.A. that she tried to kill herself because she could not take L.G. and his friends calling her a beaner or border hopper and that she did not want to go through life as those terms. *Id.* at 90-91. When L.A. told Principal Baker about S.A.'s suicide attempt, he told her that he would start an investigation into what had been going on at school. *Id.* at 96.[7]

---

[7] Because notes to the investigative report contain unredacted names of minors, the Court will order that exhibit be sealed. *See* [R. 25-9].

Regarding training, L.A. testified that Perry County Schools would send a brochure home with students at the beginning of each school year detailing its anti-bullying policy and that parents would sign the brochure saying they had read over it with their children.[8] *Id.* at 127-28. Otherwise, when asked about the allegations in the Complaint, L.A. admitted she did not know what training or supervision teachers or staff at R.W. Combs Elementary received with respect to bullying, *id.* at 135-36:8-9 ("I, personally, don't know anything about how they train them."), but she believed the training was insufficient because it was not implemented, pointing to the bullying of S.A. *Id.* at 136-37. When asked specifically about what Superintendent Jett and Principal Baker knew and should have done, L.A. acknowledged that she had no knowledge that Jett or Baker was aware L.G. was bullying S.A., other than the fourth grade incident reported to Baker. *Id.* at 139-40. She further testified that her daughter's experience led her to conclude that Superintendent Jett and Principal Baker ignored protocol because the behavior should have been reported to them by a teacher and then they should have taken actions. *Id.* at 139-42.

Through her Complaint, S.A. alleges that the Defendants are liable for not preventing L.G.'s bullying or for otherwise not taking actions to abate the problems. [R. 1]. She pleads the following claims: gross negligence under Kentucky law (Count I); violation of KRS 344.280 (Count II); intentional infliction of emotional distress under Kentucky law (Count III); U.S. Constitution 14th Amendment, brought pursuant to 42 U.S.C. § 1983 (Count IV); and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) *et seq.* (Count V). *See id.* at 4-9. Following

---

[8] S.A. attached a partial copy of the Perry County Schools Code of Conduct Handbook for 2018-2019 as an exhibit to her Response. *See* [R. 28-1]. Under "Office Discipline Referral Major Problem Definitions," both "abusive language/inappropriate language/profanity" and "harassment/bullying" are defined. *See id.* at 2. Relatedly, the Defendants attached the "Bullying/Hazing" policy in effect at the time of the incidents in this case as an exhibit to their Motion. *See* [R. 25-8].

discovery, the Defendants moved for summary judgment, and the motion has been fully briefed.[9]
[R. 25; R. 28; R. 29].  The matter stands submitted for review.

## II.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  When considering a motion for summary judgment, the Court must construe the evidence
and draw all reasonable inferences from the underlying facts in favor of the nonmoving party.
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*,
578 F.3d 407, 414 (6th Cir. 2009).  The Court may not "weigh the evidence and determine the
truth of the matter" at the summary judgment stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 249 (1986).  The Court "need consider only the cited materials, but it may consider other
materials in the record."  Fed. R. Civ. P. 56(c)(3).

The initial burden of establishing that no genuine dispute of material fact exists rests with
the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies
this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a
"genuine issue" for trial.  *Id.* at 324-25.  When, as here, defendants move for summary judgment,
"[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be
insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."
*Anderson*, 477 U.S. at 252.

---

[9] The Defendants' motion for summary judgment is longer than permitted by the Local Rules, and no motion
for leave to file excess pages was filed.  *See* L.R. 7.1(d) (motions not to exceed 25 pages without leave of
court); *see also* [R. 25-1 (memorandum is 37 pages)].  Additionally, S.A.'s response was filed a day late. *See* [R. 28; R. 29, p. 1 n.1].  Although the Court will overlook these procedural defects and consider the
briefing on the merits in this instance, all counsel are cautioned that, in the future, the Court may strike
filings for non-compliance with either the Local Rules or orders of the Court.

Where "a party fails to support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed.  Fed. R. Civ. P. 56(e)(2).  A fact is "material" if the underlying substantive law identifies the fact as critical.  *Anderson*, 477 U.S. at 248.  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.

### III.    Analysis

Through her Complaint, S.A. asserts federal and state law claims against the Perry County Board of Education and against Superintendent Jett, Principal Baker, and Ms. Watts in their individual and official capacities.  *See* [R. 1].  All defendants now "move the Court to grant them summary judgment," and argue "there are no material issues of fact as to their liability for the allegations asserted against them in this case and they are entitled to Judgment as a matter of law." [R. 25, p. 1].

Whether the Defendants can be found liable for S.A.'s claims turns largely on what they knew and when *and* how they responded to known reports of bullying.  The Court considers S.A.'s and L.A.'s testimony together and observes that their testimony, at times, overlaps and, at times, diverges.  The Court has reviewed the record in detail and has found, at most, two instances where L.G.'s bullying of S.A. was actually brought to the attention of a school official: (1) the fourth grade incident, as reported by L.A., when L.G. called S.A. a "beaner" and L.G. was directed to apologize to S.A.; and (2) the fifth grade incident, as reported by S.A., when L.G. was sent to the principal's office by Ms. Dunn after telling S.A. to shut up and go back to Mexico.  S.A. also relies on her own testimony that she once tried to report L.G.'s bullying to Ms. Watts but was cut off,

that other students reported their own bullying by L.G. to Ms. Watts, and that Ms. Watts once

expressed frustration in class with other parents calling to complain about bullying.  *See supra* §

I.  Notably, S.A. testified repeatedly that the *sole time* she reported L.G.'s bullying to school

officials was after the fifth grade incident, [R. 25-2, pp. 41:15-18; 44:14-22; 46:11-13], and that

she did not tell her parents about the bullying.  *See, e.g.*, *id.* at 40:5-9.  L.A. likewise testified that

the *only time* she reported L.G.'s behavior before the suicide attempt was when she spoke with

Principal Baker after being informed of the fourth grade incident and that this was the only incident

with L.G. that S.A. reported to her.  [R. 25-3, pp. 50-51].

### A.  Federal Claims

S.A.'s Complaint pleads two federal causes of action.  First, S.A. seeks redress for violation

of her constitutional rights pursuant to 42 U.S.C. § 1983.  [R. 1, pp. 6-7].  Second, she seeks redress

under Title VI of the Civil Rights Act of 1964.  *Id.* at 7-8.  As will be discussed below, S.A.'s

federal claims fail for similar reasons: she has failed to raise a genuine issue of material fact that

the Defendants' actions were deliberately indifferent to any harassment she faced from L.G.  *See*

*Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 852 (6th Cir. 2016); *see also Brooks v. Skinner*,

139 F. Supp. 3d 869, 881-82 (S.D. Ohio 2015).

### 1.  § 1983 Claims

S.A. first alleges that:

[t]he Defendant Board of Education of Perry County and Defendants Jett and
Baker, acting under color of state law, deprived the Plaintiff S.A. of the rights,
privileges or immunities secured by the Equal Protection Clause of the Fourteenth
(14th) Amendment to the United States Constitution. The named Defendants,
without justification, have internationally [sic] discriminated against the Plaintiff
S.A. based on sex and national origin.

[R. 1, p. 6 ¶ 41].  As a preliminary matter, S.A.'s § 1983 official-capacity claims against

Superintendent Jett, Principal Baker, and Ms. Watts are duplicative of her claims against the Board

of Education.  *See Thorpe ex rel. D.T. v. Breathitt Cnty. Bd. of Educ.*, 932 F. Supp. 2d 799, 802

(E.D. Ky. 2013) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996)); *see also*

*Brooks*, 139 F. Supp. 3d at 890 ("Because the official-capacity claims under § 1983 against

Hasselbusch and Skinner are duplicative of the § 1983 claim against RULH, summary judgment

is granted on plaintiffs' official-capacity claims against Hasselbusch and Skinner.").  Therefore,

summary judgment will be granted in favor of Superintendent Jett, Principal Baker, and Ms. Watts

as to the official-capacity claims against them, which leaves only S.A.'s individual-capacity claims

against these Defendants and her municipal liability claim against the Board of Education.

The Court will first focus its discussion on the individual-capacity claims against Principal

Baker and Ms. Watts.  The Court will then discuss the supervisory liability claim against

Superintendent Jett and the municipal liability claim against the school board.

### a. Individual-Capacity § 1983 Claims – Baker and Watts

To establish liability under 42 U.S.C. § 1983, S.A. must demonstrate: (1) that she was

deprived of a right secured by the Constitution or laws of the United States, and (2) that she was

subjected or caused to be subjected to this deprivation by a person acting under color of state law.

*Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000).  The analysis in this case will focus

on whether S.A. has presented sufficient evidence that she was deprived of her constitutional

rights.  Within this context, S.A.'s Complaint only references the Equal Protection Clause of the

Fourteenth Amendment.  [R. 1, pp. 6-7].  In their brief, however, the Defendants also analyze her

§ 1983 claims through a substantive due process lens.[10]  *See* [R. 25-1, pp. 23-27].  The Court will

briefly address each of these theories in reverse order below.

---

[10] S.A. did not plead a substantive due process claim.  *See generally* [R. 1].  Instead, her Response, [R. 28],
belatedly and in cursory fashion, makes substantive due process arguments.  However, claims may not be
added, nor can a complaint be amended, in this way.  *See Tucker v. Union of Needletrades, Indus. & Textile*
*Emps.*, 407 F.3d 784, 789 (6th Cir. 2005) (affirming district court's refusal to consider a legal argument

### i. Substantive Due Process Theory

The Court first considers S.A.'s § 1983 claims under a substantive due process theory. Here, S.A. generally asserts that the Defendants are responsible for failing to intervene and curb L.G.'s bullying of her, which led to her suicide attempt. *See generally* [R. 1 (outlining the facts on which S.A. bases her claims)]. As a general matter, courts have concluded that the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Accordingly, a state has no obligation to protect the life, liberty, or property of citizens against wrongs by private actors, and "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

To succeed on this theory, then, S.A. must show that she falls within one of the recognized exceptions to the general rule: (1) the state-created danger exception; (2) the special relationship exception; or (3) the shocks the conscience exception. *See Meyers v. Cincinnati Bd. of Educ.*, 343 F. Supp. 3d 714, 723-26 (S.D. Ohio 2018), *aff'd*, 983 F.3d 873 (6th Cir. 2020) (citing, among others, *Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006) (state-created danger); *Soper v. Hoben*, 195 F.3d 845 (6th Cir. 1999) (special relationship); *Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014) (shocks the conscience)). S.A. cannot succeed under any of these exceptions.

*State-Created Danger Exception.* To succeed under the state-created danger exception, S.A. must show: "(1) an affirmative act that creates or increases the risk to the plaintiff, (2) a special danger to the plaintiff as distinguished from the public at large, and (3) the requisite degree of state culpability." *Stiles*, 819 F.3d at 854. "The ultimate question in determining whether an

---

made for the first time in response to a motion for summary judgment because plaintiff could have moved to amend her complaint before dispositive motions were filed). In the interest of thoroughness, the Court will briefly address the substantive due process arguments.

affirmative state action increased danger to an individual is whether the individual was safer before the state action than after it." *Id.*

On this record, S.A. fails under the first element: she has not shown any of the Defendants' actions constituted an affirmative act that increased any risk against her. Instead, S.A. complains only generally about omissions on behalf of the Defendants, such as their failure to take steps to train/supervise teachers, failure to eliminate harassment and bullying, and failure to implement anti-bullying policies. *See, e.g.*, [R. 25-10, p. 4 (L.A.'s answers to interrogatories 15 & 16: "The Defendant was well aware of the harassment and bullying but failed to take any steps to eliminate the harassment and bullying.")]. Such behavior, even if true, does not entitle S.A. to relief because "[o]missions and failures to act are not affirmative acts." *Meyers*, 343 F. Supp. 3d at 723 ("The Sixth Circuit has clarified that failing to act in the school bullying context does not satisfy the element of an affirmative act.") (citing *Stiles*, 819 F.3d at 854-55).

Under Sixth Circuit precedent, "[f]ailing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [the school resource officer] are plainly omissions rather than affirmative acts." *Stiles*, 819 F.3d at 855. Because S.A. has offered nothing more than conclusory assertions that the Defendants failed to act and prevent bullying, any claims based on the state-created danger exception fail as a matter of law, and Principal Baker and Ms. Watts are individually entitled to summary judgment.

*Special Relationship Exception.* Next, the Court considers whether S.A. can survive summary judgment on her § 1983 claims based on the special relationship exception.

> Under this theory, "certain 'special relationships' created or assumed by the State with respect to particular individuals may give rise to such an affirmative duty and are enforceable through the Due Process clause to provide adequate protection." *Soper*, 195 F.3d at 852 (citing *DeShaney*, 489 U.S. 189). Generally, the special relationship doctrine has been limited to "incarceration, institutionalization, or

other similar restraint of personal liberty" and foster care.  *DeShaney*, 489 U.S. at 200, 201 n.9.

*Meyers*, 343 F. Supp. 3d at 725 (citations reformatted); *see also Stiles*, 819 F.3d at 854 (discussing special relationship exception).  Under this exception, courts have found that even a promise by school officials to protect a student is insufficient to create a special relationship.  *See Stiles*, 819 F.3d at 854 ("The actions that Plaintiffs point out to show a special relationship amount at most to knowledge of DS's situation and unfulfilled promises to remedy it, neither of which creates a special relationship.").  Moreover, "the Sixth Circuit has consistently rejected the existence of a special relationship between school officials and students based on compulsory attendance laws or the school's knowledge of a student's vulnerability." *Id.*; *see also Meyers*, 343 F. Supp. 3d at 725 ("[S]ince *DeShaney*, every circuit court to address the issue has found that no special relationship exists between students and school administrators. ") (collecting cases).  Thus, to the extent that S.A. bases the Defendants' liability on their relationships to her as a student, such relationships are insufficient as a matter of law, and she cannot show that she fits within the special relationship exception.  Principal Baker and Ms. Watts are therefore individually entitled to summary judgment for these claims.

*Shocks the Conscience Exception*.  Last within the substantive due process context, the Court considers whether S.A. can survive summary judgment under the shocks the conscience exception.  The Court observes that certain Sixth Circuit cases do not address this theory for a substantive due process claim.  *See, e.g.*, *Stiles*, 819 F.3d 834.  Still, the Defendants have argued that Plaintiff cannot survive summary judgment under this theory, so the Court will briefly address it here.  *See* [R. 25-1, pp. 26-27].  One court has described such a claim as follows:

> Substantive due process protects individuals from government actions that shock the conscience.  It also protects the right to be free from arbitrary and capricious governmental actions, which is another formulation of the right to be free from

conscience-shocking actions.  Conduct shocks the conscience if it violates the decencies of civilized conduct.  Actions that shock the conscience are generally so brutal and offensive that they do not comport with traditional ideas of fair-play and decency.

*Meyers*, 343 F. Supp. 3d at 725-26 (internal citations and quotation marks omitted).

In this case, the actions (or, really, the inactions) that the Defendants are alleged to have taken do not meet the exacting standards for a shocks the conscience claim.  That is, the record simply fails to support an argument that the individual Defendants took any actions that violated the decencies of civilized conduct.  *See id.*  For example, there is no evidence that the Defendants lied or otherwise tried to cover up L.G.'s actions, behavior that other courts have found sufficient to state a claim.  *See id.* at 726 (on a motion to dismiss, describing potential "conscience shocking" actions to include concealing and covering-up the level of violence a student faced, affirmatively misrepresenting an attack and the extent of a student's injuries, destroying surveillance recordings for the purpose of covering up danger at the school, encouraging violence at school, and encouraging injuries from violence be minimized).  Instead, the record demonstrates that, in the very narrow instances where school officials were alerted to L.G.'s bullying of S.A., they responded reasonably based on the information they had at the time. *See infra* § III(A)(1)(a)(ii)-(2) (discussing deliberate indifference).  Therefore, S.A.'s § 1983 claims fail under this exception as well, and Principal Baker and Ms. Watts are individually entitled to summary judgment.

### ii.      Equal Protection Theory

The Court next considers S.A.'s § 1983 claims based upon an equal protection theory.  In this context,

> [t]he Sixth Circuit recognizes two methods of proving an equal protection violation based on a school official's response to peer harassment: (1) disparate treatment of one class of students who complain about bullying as compared to other classes of students, and (2) deliberate indifference to discriminatory peer harassment.  Stated

another way, a plaintiff "must show either that the defendants intentionally discriminated or acted with deliberate indifference."

*Stiles*, 819 F.3d at 851-52 (internal citations omitted).

Regarding the first theory, S.A. has put forward no evidence to demonstrate that she was treated differently by the Defendants by virtue of being Hispanic or female than other students who were also bullied by L.G. and have a different national origin or are male; her equal protection claims based on this theory accordingly cannot survive summary judgment. *See id.* at 852 ("The district court correctly found that Plaintiff offered no evidence of how Defendants treated other students—male or female, heterosexual or homosexual—who similarly complained about or suffered from bullying. Therefore, DS's equal protection claim cannot survive summary judgment based on a disparate treatment theory.").

Regarding the second theory, S.A. must first offer evidence that she was subjected to discriminatory peer harassment. *Id.* Second, she "must offer evidence that school officials responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of known circumstances." *Id.*; *see also Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 618-19 (6th Cir. 2012) (table). The *Stiles* court explained that "[t]he deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX cases."[11] *Stiles*, 819 F.3d at 852. The court explained the standard as follows,

> This standard is not a mere reasonableness standard, and there is no reason why courts cannot identify a response as not clearly unreasonable as a matter of law. The Supreme Court emphasized in *Davis* that federal funding recipients need

---

[11] Courts analyze Title VI and Title IX claims under the same standards, so the Court may cite to cases that employ either standard. *See Brooks*, 139 F. Supp. 3d at 882 n.5 ("Courts employ the *Davis* test when resolving both Title VI and Title IX claims because the two statutes are parallel in the liabilities imposed on entities receiving public funds and differ only with respect to their prohibition on the type of harassment, i.e., race versus sex discrimination.") (referencing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)).

not purge their schools of actionable peer harassment or engage in particular disciplinary action to avoid Title IX liability.  Title IX does not give victims a right to make particular remedial demands.  Moreover, courts should avoid second-guessing school administrators' disciplinary decisions.

*Id.* at 848 (cleaned up) (citing and quoting *Davis*, 526 U.S. 629 (1999); *Vance v. Spencer Cnty.*, 231 F.3d 253 (6th Cir. 2000)).  The Court will bypass discussion of the first element concerning discriminatory peer harassment and will instead focus on S.A.'s lack of evidence to demonstrate that either Principal Baker or Ms. Watts was deliberately indifferent to any racial or sex-based harassment she faced from L.G.

Regarding Principal Baker, the evidence reveals at most two incidents in which he knew of L.G.'s behavior toward S.A.—the fourth grade incident, as reported by L.A., where L.G. called her a "beaner," [R. 25-3, pp. 39:9-12], and the fifth grade incident, as reported by S.A., when L.G. told her to shut up and return to Mexico and Ms. Dunn sent L.G. to the principal's office, [R. 25-2, pp. 22:17-24].

Concerning the fourth grade incident, the evidence reveals school officials took action upon being advised of L.G.'s behavior.  Indeed, Ms. Dunn took S.A. to the principal's office to report the incident and so S.A. could describe what happened, [R. 25-3, pp. 36-38], and S.A. was told that L.G. would be required to apologize to her, *id.* at 42.  Principal Baker also talked to L.G. about his behavior, and L.G. did in fact apologize over the weekend to S.A, which S.A. accepted.  *Id.* at 41-44.  When L.A. called Baker the following week to request more from the school, Principal Baker advised he would talk again to L.G.  *Id.* at 44-49.

Concerning the fifth grade incident, school officials' responses were likewise reasonable based on known facts.  Ms. Dunn did not ignore the behavior but asked S.A. to explain what happened.  [R. 25-2, pp. 22-28].  S.A. testified that Ms. Dunn also talked to L.G. and sent him to the principal's office.  *Id.* at 26-28.  Although the record fails to disclose what punishment, if any,

L.G. received other than being sent to the principal's office, Principal Baker took other actions to confront bullying at the school around this time and to enforce the school's anti-bullying policy. *Id.* at 26-27, 31. For example, S.A. testified that, during her fifth and sixth grade years, Principal Baker attended her class and spoke directly to students about bullying and the school's policy and expectations. *Id.* at 30:24-31:10. Although L.G.'s bullying continued, S.A. never reported later incidents to school officials, and similarly never reported any further incidents to her parents. *Id.* at 41:15-18, 44:14-22, 46:11-13.

Importantly, federal law does not permit S.A. to make a particular remedial demand, and courts are instructed to "avoid second-guessing school administrators' disciplinary decisions." *Stiles*, 819 F.3d at 848. Given the nature of these incidents and the length of time between them, the Court is unwilling to second guess Principal Baker's responses to isolated episodes of L.G.'s bullying of S.A. that were reported to him, at most, on two occasions and separated by more than a year. *See Brooks*, 139 F. Supp. 3d at 874, 891 (denying principals' summary judgment motion on § 1983 claims when the record showed they each had actual notice of six incidents of racial harassment and had personally used racial slurs or made racial comments); *cf. Stiles*, 819 F.3d at 851 ("One-and-a-half years of similar, but not rote, responses to incidents that each involved a different student or group of students do not amount to clearly unreasonable conduct, even if they might become so over the course of a longer period of time."). Notably, L.A. testified she thought the issues with L.G. had resolved after the fourth grade incident because she never heard anything else about L.G.'s behavior toward S.A. until after the suicide attempt. *See* [R. 25-3, p. 55]. Given that Principal Baker only received limited reports about the two incidents, which were separated by more than a year, he too understandably thought the issues were resolved.[12] In such a posture,

---

[12] The Court observes that Principal Baker *did* initiate an investigation after being informed of S.A.'s suicide attempt. *See* [R. 25-3, pp. 96-97].

S.A. has failed to raise a genuine issue of material fact regarding whether Principal Baker's responses were "not clearly unreasonable." *See Stiles*, 819 F.3d at 849.

Similarly, regarding Ms. Watts, S.A. points to no evidence that Ms. Watts was advised by S.A. or anyone else that L.G. was bullying S.A.  Instead, S.A. points to evidence: that she once tried to report L.G.'s bullying of herself (when she accompanied M. to report M.'s own problem with L.G.) but was cut short by Ms. Watts, [R. 25-2, pp. 33-36]; that other students reported to Ms. Watts that they were called names by L.G. on occasion (and Ms. Watts instructed them to stop), *id.* at 29:15-30:19; and that Ms. Watts once expressed frustration in class that parents called her to report bullying, *id.* at 57-58; *see also* [R. 25-3, pp. 56:25-57:8; R. 28, p. 7].  However, these instances considered alone or in combination fail to create a genuine issue of material fact that Ms. Watts acted with deliberate indifference.

First, although the record shows Ms. Watts ordered S.A. to "[j]ust go on" when S.A. approached Ms. Watts with M. to report that L.G. called M. a "whore," Ms. Watts clearly believed S.A. was present only to report what happened to M.  [R. 25-2, pp. 33-37].  And S.A. never corrected that impression at the time, or afterward, by telling Ms. Watts about L.G.'s behavior toward her. *Id.* at 44.  Ms. Watts (indeed any of the Defendants) surely cannot be held responsible for bullying that was not reported to her.  *See Stiles*, 819 F.3d at 852 ("[T]he plaintiff must offer evidence that school officials responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of *known* circumstances.") (emphasis added).

Second, as to S.A.'s testimony that Ms. Watts overheard L.G. calling other students (not S.A.) names in class, such actions do not reflect that Ms. Watts was deliberately indifferent to known bullying.  Rather, none of these reports involved bullying of S.A. by L.G., and S.A.

repeatedly testified that she never reported the bullying to Ms. Watts.  [R. 25-2, pp. 36:24-37:1, 44:8-10].  Moreover, S.A. has wholly failed to develop the record concerning these allegations.  Given the isolated context and general nature of these allegations, the Court can hardly view Ms. Watts as being deliberately indifferent in this context.

Finally, although Ms. Watts expressed frustration that parents called her to complain about bullying, according to L.A., Ms. Watts's frustration was linked to reported bullying occurring *outside of school* in online chatrooms that was being brought "back to school."  [R. 25-3, pp. 56:25-57:8].  Importantly, Ms. Watts was not required to have a pleasant demeanor when dealing with reports of bullying, so long as her actions did not rise to deliberate indifference.  *See Stiles*, 819 F.3d at 853 ("The law does not require that a defendant have a pleasant demeanor in responding to harassment, but only that he respond to it in a manner that is not clearly unreasonable.") (cleaned up).  There is simply no evidence that Ms. Watts knew that L.G. was bullying S.A or that she was deliberately indifferent based on her observations of L.G. bullying other students.  Therefore, S.A. has failed to create a genuine issue of fact that Ms. Watts failed to sufficiently address bullying behavior that was reported to her or that she was deliberately indifferent to the same.

The Sixth Circuit's decision in *Stiles* illustrates the failure of the current record as to both Principal Baker and Ms. Watts.  There, multiple school officials were notified numerous times by the plaintiff and his mother over the course of two years about many incidents of bullying the plaintiff experienced, including physical injuries (to include the plaintiff being rammed headfirst into a wall) and name calling (to include "bitch," "faggot," and "queer").  *See id.* at 841-42.  In affirming the district court's granting of summary judgment to the defendants on the plaintiff's equal protection claim, the Court discussed how the defendants "promptly investigated each

incident of which they were aware, and each took measures within their power to punish the students found culpable and to prevent further episodes of mistreatment." *See id.* at 853.

Although it is true that courts have found merely "talking to the offender[]" as insufficient action in certain circumstances, *see Vance*, 231 F.3d at 262, S.A. has not shown Principal Baker's or Ms. Watts's actions were deliberately indifferent on these facts. Indeed, this case is unlike *Vance*, where the school only responded by talking to students after the plaintiff was stabbed in the hand and after she was held while another student took off his pants and others pulled her hair and attempted to rip off her clothes. *See id.* at 262. Further, the school in *Vance* continued to only talk to the offenders, even once it had knowledge that such measures were ineffective. *See id.* By contrast, no evidence in this case remotely suggests knowledge of ineffective measures by Principal Baker or Ms. Watts. *See id.*; *cf. Williams*, 455 F. App'x at 619 ("While there appears to be some disagreement as to whether Dahlke should have responded to the incidents in a different manner or taken further steps to identify the offending students, no one disputes that Dahlke made efforts to address the racial harassment and solicited the assistance of others to formulate a strategy.").

Pointedly, the isolated conduct known to Principal Baker and the general allegations known to Ms. Watts (concerning students other than S.A.) are far less egregious and much less frequent than those presented in *Stiles*, which the Sixth Circuit did not find sufficient to withstand summary judgment, and *much* less egregious and fewer in number than those presented in *Brooks*, which the Sixth Circuit did find sufficient to withstand summary judgment. *Compare Stiles*, 819 F.3d at 853, *with Brooks*, 139 F. Supp. 3d at 892. In light of such precedent, and case law's admonition not to second guess school administrators' decisions, the Court cannot conclude that Principal Baker's or Ms. Watts's responses to the limited bullying incidents of which they were aware were

"clearly unreasonable in light of the known circumstances." *See Stiles*, 819 F.3d at 852. Accordingly, S.A.'s §1983 equal protection claims as to Principal Baker and Ms. Watts fail, and these individual Defendants are entitled to summary judgment.

### b. § 1983 Claim Against Superintendent Jett

S.A. has put forward no evidence whatsoever that Superintendent Jett was even aware of L.G.'s bullying of S.A., much less that he was personally involved in any of the reported instances of bullying. Indeed, her Response fails even to mention Superintendent Jett. *See* [R. 28]; *see* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]"). S.A.'s § 1983 claim against him thus fails under any theory. Moreover, because she has not shown a violation of her constitutional rights, S.A. also cannot succeed on a supervisory liability claim against Superintendent Jett. *See Stiles*, 819 F.3d at 855 ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor.") (internal quotation marks omitted). Superintendent Jett is therefore entitled to summary judgment on S.A.'s § 1983 claim against him.

### c. Municipal Liability § 1983 Claim

As best the Court can decipher, S.A. also brings a municipal liability claim against the Board for failure to train or supervise its employees and for failure to enforce the school's anti-bullying policy. *See generally* [R. 1, pp. 6-7 ¶¶ 40-50]. Within the context of S.A.'s § 1983 claims, her municipality liability claim "must be examined by applying a two-pronged inquiry: (1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the County and/or the School Board is responsible for that violation." *Doe,* 103 F.3d at 505-06. Importantly, the school board cannot be held responsible only on a theory of *respondeat superior*.

*See id.* at 507 ("Under *Monell*, the County and the School Board cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right.") (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).

As explained, S.A. has not shown the violation of her constitutional rights under any theory. Therefore, she cannot succeed on her § 1983 claim against the Board of Education, and the Board is entitled to summary judgment on this claim. *Stiles*, 819 F.3d at 856 ("Plaintiffs presented no genuine issue of material fact supporting a violation of DS's constitutional rights by any school official. The district court properly concluded that the lack of any constitutional deprivation precludes a finding of municipal liability against the Board.").

### 2. Title VI Claim

Plaintiff's second federal cause of action is based on Title VI of the Civil Rights Act of 1964.[13] [R. 1, pp. 7-8]; *see Brooks*, 139 F. Supp. 3d at 881 ("Deliberate indifference to student-on-student harassment is actionable under Title VI."). The statute provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Public education entities like the Board of Education are subject to this mandate, and a "program or activity" under Title VI includes a local educational agency, system of vocational

---

[13] In her Response, Plaintiff references her sex when discussing her Title VI claim. *See* [R. 28, p. 11]. Sex discrimination is analyzed through a Title IX claim. *See Doe*, 103 F.3d at 513. Because Title VI and Title IX claims are analyzed under the same standard, the Court's analysis in respect to her Title VI claim would also apply to a Title IX claim. *See Brooks*, 139 F. Supp. 3d at 882 n.5 ("Courts employ the *Davis* test when resolving both Title VI and Title IX claims because the two statutes are parallel in the liabilities imposed on entities receiving public funds and differ only with respect to their prohibition on the type of harassment, i.e., race versus sex discrimination.").

education, or other school system.  *Brooks*, 139 F. Supp. 3d at 881 (quoting 42 U.S.C. § 2000d-4a(2)(B)) (cleaned up).  Importantly, for S.A.'s Title VI claim, only the Board of Education is the proper defendant.  *Id.*  ("In a Title VI case, the proper defendant is an entity rather than an individual.  It is beyond question that individuals are not liable under Title VI.") (cleaned up).  Therefore, the Court considers S.A.'s Title VI claim only against the Board of Education, and all other Defendants will be granted summary judgment on this claim.

To hold the Board of Education liable for student-on-student harassment under Title VI in this case, S.A. must establish: (1) the harassment was so severe, pervasive, and objectively offensive that it could be said to deprive her of access to the educational opportunities or benefits provided by the school; (2) an appropriate official had actual knowledge of the harassment; and (3) the Board of Education was deliberately indifferent to the harassment.  *See id.* at 882; *see also Stiles*, 819 F.3d at 848.  The Court will focus on the second and third elements.  *See Stiles*, 819 F.3d at 848 ("Plaintiffs, however, fall short of establishing the third element. . . . Because Plaintiffs' Title IX claim fails on this basis, we need not resolve whether the harassment DS suffered was based on sex, nor whether it was so severe, pervasive, and objectively offensive as to deprive him of educational opportunities or benefits.").

Within the context of this claim, the Court considers the actions of Principal Baker,[14] as the second element of actual knowledge "requires only that a single school administrator with authority to take corrective action had actual knowledge of the [racial] harassment."  *See id*.  In this case, and as explained previously, the evidence reveals potentially two incidents in which

---

[14] "[A]ppellate courts have required actual knowledge by the school board itself, the school superintendent, or a school principal," meaning Ms. Watts cannot be an appropriate official on these facts.  *Brooks*, 139 F. Supp. 3d at 883.  And, as mentioned previously, S.A. wholly fails to point to any evidence that Superintendent Jett had knowledge of L.G.'s behavior.

Principal Baker had actual knowledge of L.G.'s behavior toward S.A.: the fourth grade incident and the fifth grade incident.[15]  *See* [R. 25-2, pp. 27-28; R. 25-3, p. 44].

Importantly, the deliberate indifference standard that applies to S.A.'s Title VI claim is the same as that which applies to her equal protection claims.  *See Stiles*, 819 F.3d at 852  ("The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX cases."); *see also Brooks*, 139 F. Supp. 3d at 882 n.5 ("Courts employ the *Davis* test when resolving both Title VI and Title IX claims because the two statutes are parallel in the liabilities imposed on entities receiving public funds and differ only with respect to their prohibition on the type of harassment, i.e., race versus sex discrimination.").  That standard "sets a high bar for plaintiffs to recover" and "requires only that school administrators respond to known peer harassment in a manner that is not clearly unreasonable in light of the known circumstances." *Stiles*, 819 F.3d at 848 (internal quotation marks omitted).  On these facts, as more fully discussed above, S.A. has failed to show a genuine issue of material fact exists regarding whether Principal Baker's actions in relation to the fourth and fifth grade incidents were deliberately indifferent.  In

---

[15] Some courts have found "actual knowledge" may be satisfied by multiple prior incidents of abuse.  *See generally C.K. v. Bell Cnty. Bd. of Educ.*, 865 F. Supp. 2d 795, 801 (E.D. Ky. 2012) ("Sometimes, school officials' knowledge of multiple prior incidents of sexual misbehavior can create actual notice, even when no single incident is sufficiently serious.  Prior incidents also do need not to involve the plaintiff in order to create actual notice."); *see also generally Winzer v. Sch. Dist. for City of Pontiac*, 105 F. App'x 679, 681 (6th Cir. 2004) ("We have followed the Supreme Court's lead, as we must, in requiring actual knowledge of student-on-student sexual harassment in Title IX cases."); *King v. Curtis*, No. 1:14-CV-403, 2017 WL 780837, at *3 (W.D. Mich. Mar. 1, 2017).  This Court has already determined the Board had actual knowledge through Principal Baker's knowledge of the fourth and fifth grade incidents.  Even so, S.A.'s Title VI claim fails on the deliberate indifference element for all the reasons previously discussed.  *See supra* § III(A)(1)(a)(ii).

other words, her Title VI claim fails for all the same reasons her equal protection claims fail.  *See supra* § III(A)(1)(a)(ii).

What is more, S.A. herself testified that the only time she actually reported L.G.'s bullying to *any* school official was in the fifth grade when Ms. Dunn found her crying, and L.A. similarly only testified to reporting one incident.  The Board simply cannot be held liable under Title VI for bullying that was never reported.  *Brooks*, 139 F. Supp. 3d at 888  ("[P]laintiffs have not provided any evidence that Austin reported these comments to any other official at RULH.  Thus, RULH could not be deliberately indifferent to that harassment. . . . In the absence of any evidence showing Austin reported those comments to the superintendent or school board, *i.e.*, someone with authority to address the alleged discrimination and to institute corrective measures on the [school district's] behalf, RULH cannot be held liable for such comments under Title VI.") (cleaned up).  The Board of Education is therefore in entitled to summary judgment on her Title VI claim.[16]

### B.  State Law Claims

The Court has determined that the Defendants are entitled to summary judgment on all of S.A.'s federal claims.  *See supra* § III(A).  This leaves only her state law claims of gross negligence, violation of KRS 344.280, and intentional infliction of emotional distress.  *See* [R. 1, pp. 4-6].  In such a posture, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."  *See Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996), *amended on denial of reh'g*, No. 95-5120, 1998 WL 117980 (6th Cir.

---

[16] Because S.A.'s federal claims fail as a matter of law, the Court does not need to discuss the other defenses put forward by the Defendants, including qualified immunity or immunity under the Paul D. Coverdell Teacher Protection Act, 20 U.S.C. § 7941.  *See* [R. 14 (listing defenses)]; *see also* [R. 25-1]; *see generally Stiles*, 819 F.3d at 856 ("Because there was no constitutional violation by any of the individual Defendants, we do not address the parties' arguments regarding the defenses of qualified immunity and the statute of limitations.").

Jan. 15, 1998); *see also Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) ("Under 28 U.S.C. §
1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it
has dismissed all claims over which it has original jurisdiction.  If the federal claims are dismissed
before trial, the state claims generally should be dismissed as well.") (internal quotation marks
omitted).

Indeed, although a court *may* exercise supplemental jurisdiction over state law claims after
having disposed of all federal claims through motions for summary judgment*, see Musson
Theatrical*, 89 F.3d at 1255, courts often decline to do so.  *See Rothe*, 577 F.3d at 709 (reviewing
district court's grant of summary judgment and observing, "[u]pon dismissing Brooks's federal
claims, the district court properly declined to exercise supplemental jurisdiction over Brooks's
remaining state-law claims"); *Weser v. Goodson*, 965 F.3d 507, 518-19 (6th Cir. 2020); *Dunn v.
Adams, Stepner, Woltermann & Dusing, PLLC*, No. CV 19-4-DLB-CJS, 2021 WL 3410042, at *8
(E.D. Ky. Aug. 4, 2021).  The Court perceives no unique circumstances on this record that suggest
an exercise of supplemental jurisdiction over S.A.'s remaining claims would be advisable in this
case.  *See Dunn*, 2021 WL 3410041, at *8; *see also Fox v. Brown Mem'l Home, Inc.*, 761 F. Supp.
2d 718, 723-24 (S.D. Ohio 2011) (listing factors district courts may consider in declining to
exercise supplemental jurisdiction).

Instead, as a matter of comity, S.A.'s state law claims and whether the Defendants are
entitled to any immunity under Kentucky law are areas in which state court adjudication seems
advisable.  *See Fox*, 761 F. Supp. 2d at 724 (noting courts should weigh, among other factors,
"comity, fairness, and judicial economy).  Therefore, the Court will decline to exercise
supplemental jurisdiction over S.A.'s state law claims and will dismiss them without prejudice
pursuant to 28 U.S.C. § 1367(c).

## IV.    Conclusion

For the foregoing reasons, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. The Defendants' Motion for Summary Judgment **[R. 25]** is **GRANTED** in part and **DENIED** in part.

2. Judgment will be **ENTERED** in favor of the Defendants on S.A.'s federal claims (Counts IV and V).

3. S.A.'s state law claims (Counts I, II, and III) will be **DISMISSED** without prejudice.

4. Because one of the Defendants' exhibits contains unredacted names of minors, the Clerk of Court **SHALL SEAL** that exhibit **[R. 25-9]**.

5. A separate judgment shall issue.

This the 15th day of September, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY